THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. TROY E. BROWN, Defendant-Appellee.

Fourth District   No. 4—87—0299

Opinion filed November 12, 1987.—Rehearing denied December 17, 1987.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellee.

JUSTICE LUND delivered the opinion of the court:

In January 1987, defendant was indicted for armed robbery, a Class X felony, in that on January 2, 1987, while armed with a dangerous weapon, a gun, he took money from a victim by threatening the imminent use of force. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a).) Defendant moved to quash his arrest and suppress all evidence seized from his presence and from the house in which he was arrested, statements he made, and the identification resulting from a showup conducted at the time of his arrest. Following a hearing on the defendant's motion, the circuit court of Champaign County on April 6, 1987, allowed the motion to quash the arrest and suppress the evidence seized thereafter. The State filed a certificate of impairment and appeals the ruling of the circuit court. 107 Ill. 2d R. 604(a).

At the hearing on defendant's motion to suppress, six witnesses testified: three police officers involved in the search of the residence in which defendant was found; defendant's grandmother, owner of the house in which defendant was found; and defendant's sister and her 13-year-old cousin, who were present when the police arrived and entered the house.

Officer Kreiling of the Champaign police department testified that on January 2, 1987, at about 8:05 a.m., he went to Sunset and Busey Streets after hearing a police radio dispatch that an armed robbery had just occurred there. Kreiling testified Officer Kosta also answered the call and met the victim of the offense. The armed robbery had taken place inside the victim's vehicle about 75 feet east of Sunset and Busey. On the morning of the offense, there was about an inch of fresh snow on the ground. Kreiling examined the scene and found two or three sets of vehicle tracks in the snow. Kreiling saw the tracks of a person "as if they were running" about 75 feet east of Busey, where the tracks were approximately 5½ to 6 feet apart. Kreiling said the footprints began near some vehicle tracks in the snow on Sunset and, "at the beginning they were bunched up close together," spreading out to 5½ to 6 feet apart about 8 to 10 feet away from the vehicle tracks and heading southwest.

Kreiling testified the victim of the offense described the details of the armed robbery to Officer Kosta. The victim identified one set of vehicle tire tracks in the snow as belonging to his vehicle, pointed out the footprints at a location the black male perpetrator left his vehicle, told officers the man left the truck and ran, and identified the direction the perpetrator ran as the direction of the footprints. Kreiling testified there were no other footprints around the area of the vehicle tracks near Sunset and Busey.

Kreiling followed the footprints for close to a mile and found the last footprint was 6 inches from the front door of the house at 1213 West Beardsley. Throughout the time he followed the footprints (about 30 minutes), they were clear, remained unbroken, and there were no other footprints around them.

Police Lieutenant Parker testified that on January 2, 1987, he assisted Kreiling in following the footprints for a distance, and then pursued the search by squad car. Parker said after hearing that Kreiling found the tracks stopped at a house, he proceeded to 1213 West Beardsley, and parked his car west of that location. He found no tracks in the area as he proceeded east, and no tracks on the west side of the house—the only tracks around the house were those that ran up to the front door.

Officer Kreiling testified that when he arrived at the front of the house, he advised METCAD of his location and took a position just east of the front door, flat against the wall. Lieutenant Parker and Officer Tharp, approaching the house from the west, covered the back of the residence while waiting for additional help. No one contacted METCAD or the State's Attorney to secure a warrant.

Kreiling testified that shortly after he called METCAD for backup, a black female teenager exited the door and started walking down the sidewalk away from him, facing west, wearing pajamas and a robe. Kreiling testified he may have touched her shoulder to get her attention, identified himself as a police officer, and asked her if everything was all right inside the residence. She said everything was fine, and Kreiling said he then asked her if there were any black males inside the residence. He said she thought for a moment and then responded that her cousin's boyfriend was inside. Kreiling said he then asked her if he could enter the residence and speak with him, and she answered affirmatively. Kreiling said he entered the house at about 8:36 a.m., with Officer Tharp behind him, and, as he was entering the residence, he observed a black male in underwear putting on camouflage pants. Kreiling described his discussion with the black male (the cousin's boyfriend) as follows:

> "I asked the black male if he at any time had been out of the house in the morning. He stated no, he had just gotten out of bed. I quickly explained that I needed to—about the situation that we were in, that an armed robbery had just occurred, and I asked him if he would step outside with me, and he stated he would. I then escorted him to his bedroom so that he could complete getting dressed, and he then exited the residence with me, stood at the front steps."

Kreiling said the victim was outside the residence in a squad car and, on observing this male, said he was not the armed robber.

Officer Kreiling testified he later found out the name of the teenager who permitted him to speak to her cousin's boyfriend was Jackie Brown. He said he never withdrew his weapon from the holster and Jackie Brown neither appeared threatened nor showed in her demeanor that she was not *willingly* responding in the affirmative when he asked if he could go in and talk to her cousin's boyfriend. Kreiling acknowledged he did not hear anything going on inside the house, and he did not ask the teenager if she lived there or how old she was. Kreiling testified that if Jackie Brown had told him he could not go in the house, he would not have gone in.

Officer Tharp testified that when he entered the residence he was accompanied by Sergeant Spanglo and they observed three black females together in the living room—Michelle Brown, Jackie Brown (having returned from outside), and Monica Robinson—with an infant. Tharp testified the females were dressed in what appeared to be bedclothes, two wearing lightweight flannel pajamas or housecoats, with one wearing a sweatshirt and a pair of slacks. Tharp testified he and

Sergeant Spanglo talked to the females, explaining why they were there and asking if there were any other black male occupants of the residence. Tharp said the females replied there was no one else in the residence. Tharp said he and Sergeant Spanglo both asked permission to look through the rest of the house, and permission was granted by both Michelle Brown and Monica Robinson. Tharp said he and Sergeant Spanglo asked Michelle Brown if she had authority to give consent to search the house and learned she did not live there. According to Officer Tharp, Michelle Brown told the officers the house was owned by her grandmother, who was out of town, and she was taking care of the residence for her grandmother in her absence. Tharp testified the females did not appear upset or intimidated and nothing was done to suggest anything would happen to them if they did not agree to let the officers look through the house.

Officer Tharp testified that after obtaining permission to search the residence, he and Sergeant Spanglo started down the hall checking bedrooms and, on opening a door at the end of the hall, observed another black male lying on the bed. He testified that at no time had any of the females indicated the officers should not enter that room. He said none of the officers drew their weapons at any time.

Officer Kreiling testified that after determining the cousin's boyfriend was not the perpetrator, he reentered the residence and learned from Officer Tharp and Sergeant Spanglo that they had received permission to continue searching the house for another black male. Kreiling testified Tharp opened the door to the bedroom and found another black male, the defendant, lying on the bed and a firearm under the bed. Kreiling testified he placed defendant under arrest for armed robbery and took him outside, where the victim identified defendant as the man who had robbed him. Kreiling further testified he seized the firearm from beneath the bed and found it similar to the description of the firearm given by the victim.

Michelle Brown testified her grandmother owned the residence at 1213 West Beardsley in Urbana and was out of town in Texas; her grandmother had asked Michelle to watch over the house and take care of it while she was away. Michelle testified defendant is her brother and he resides with her grandmother at 1213 West Beardsley.

Brown recalled having a conversation around noon on January 2, 1987, with Officers DeJong and Kreiling and acknowledged she told them something to the effect that her grandmother had made arrangements with her to take care of the residence in her absence, including collecting the mail and cleaning. She acknowledged telling DeJong and Kreiling she had been in defendant's bedroom on numerous

occasions when he was present, with his knowledge and consent. Michelle said the officers did not ask her anything about whether she had access to defendant's bedroom; and, asked whether she told these officers that she had access to the entire residence, she answered, "I don't remember."

On cross-examination by defense counsel, Michelle testified (1) when the door to defendant's bedroom was closed, she would not enter without knocking and she was not allowed in the room when no one was there; (2) no one was allowed in the room when no one was there; (3) she never had authority from anyone to let anyone into defendant's room; and (4) defendant never gave her authority to go into the room without his permission, and did not give his grandmother permission to enter the room without his authority.

Michelle said she did not sleep at the house every night while her grandmother was in Texas, but just occasionally. She had a key to the front door and was to watch the house, but said she had not meant to indicate to the officers that she had a right to go into defendant's bedroom. She said defendant was not home when she went to bed the night before, and she did not know he was in the house when she granted consent to search. She testified the officers were already in the house and she gave consent to search because she thought it would be useless to deny consent and they would search anyway. She said the officers did not tell her what they were doing or that they were looking for an armed robbery suspect until after they searched the house and arrested her brother.

Michelle Brown further testified (1) she did not give any police officers permission to come into her grandmother's house; (2) Jackie Brown was her cousin, was 13 years old on January 2, and was her overnight guest; and (3) Monica Robinson was Jackie's schoolmate, was 14 at the time, and had also spent the night. She said her boyfriend was the father of her 3½-month-old child, was engaged to marry her, and had stayed overnight with her in the bedroom. She said when the police came in, her boyfriend was in bed with her and an officer asked him to get up and put something on and step outside. She said the officer did not tell him why, but her boyfriend cooperated.

On redirect examination Michelle Brown gave the following answers to questions by the prosecutor:

"Q. [By prosecutor] If it's so clear to you now, Miss Brown, that nobody has permission to enter [defendant's] bedroom without his consent, then why on January 2nd when the police were going towards his bedroom didn't you stop them?

* * *

A. [By Michelle Brown] Because I was startled, it was 8:30 in the morning, I didn't really know what was going on anyway. I just knew that the police were there, and I didn't think I had a choice to tell them if they could search the house or not, that is why.

Q. But, at that point you had already had a conversation with them, is that correct?

A. No, they just—they didn't believe that there was—I mean *they didn't believe that we were the only people there. They just asked if they could take a look. I was telling the truth, I didn't know he was there,* so I had nothing to fear for them to—I mean, you know, *I didn't have any reason to tell them that they couldn't.*

Q. And *you do admit that you told them they could look around,* is that right?

A. *Yes.*

Q. Jackie Brown was your cousin, right?

A. Yes.

Q. And her grandmother is the same grandmother that owns the house?

A. Yes." (Emphasis added.)

The State recalled Officer Kreiling and he testified that at about 12:15 p.m. on January 2, 1987, he returned to 1213 West Beardsley with Investigator DeJong. DeJong questioned Michelle Brown and Kreiling heard the questions and answers. Kreiling testified Michelle told them her grandmother owned the house and she, Michelle, was staying at the residence and was in charge of it. Kreiling said Michelle also told the officers (1) defendant was living at the residence; (2) her (Michelle's) primary responsibility while her grandmother was gone was cooking and cleaning for defendant; and (3) she had access to the entire residence, including defendant's room. Kreiling testified Michelle told them she had been in defendant's room on numerous occasions with his knowledge and consent.

Defendant's grandmother was called as a witness by defendant and testified she owned the house, defendant was her grandson, and he lived with her and paid her rent. She said when she went to Texas in December she gave Michelle Brown and her boyfriend permission to look after the house and gave Michelle the key. Asked by defense counsel whether that permission included permission to go into defendant's bedroom when the door was closed, she said no one had permission to go into that room when the door was closed, including

herself. Asked whether the permission she gave Michelle to stay in the house included permission to clean defendant's bedroom, she said it did not.

Jackie Brown, called as a witness by defendant, testified she was 13 on January 2, 1987, and she had stayed overnight with her cousin, Michelle Brown. Jackie testified that at about 8:35 a.m., she left the house to warm up Michelle's car. She said when she opened the door, a police officer was standing at her right side with his badge and had his gun in his right hand pointed toward the ground. She said she was just coming out the door and was not yet on the porch when the officer asked her to step outside and asked if there were any black males in the house. She said she answered yes and the officer asked if he could go into the house. Although Jackie could not remember her exact response, she testified "It was more of a yes, but I didn't say yes. It was an 'I don't know, I don't care.' " She said she did not think her response would make a difference and thought the police would enter anyway. Jackie acknowledged she did not remember her response to the officer when he asked to enter and said she also did not recall his asking her if everything was all right in the house.

In ruling on the motion, the trial judge remarked that the question of consent on all of the evidence was clouded and was a somewhat questionable proposition under the law, "[m]ost particularly the authority of the initial person, Jackie Brown, to consent to the entry in the first place." The trial judge found the facts did not bring the case within the traditional definition of hot pursuit, and that the case had to stand or fall on an analysis of whether or not exigent circumstances existed from the perspective of what the officers knew at the time of the search. The court noted it did not mean to minimize the good work which was done in following the footprints to the house or the professional fashion in which the investigation was conducted, but ruled that under the case authority there was not such a compelling need to enter the house as to permit upholding the warrantless entry on the basis of exigent circumstances. The court therefore allowed the motion to quash the arrest and suppressed the evidence seized thereafter.

■■ It is a well-established rule in this State that a trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299, 303; *People v. Fonville* (1987), 158 Ill. App. 3d 676, 684, 511 N.E.2d 1255, 1261.) After citing this standard, the supreme court in *Winters* found the fact finder's order quashing the arrest and suppressing the evidence manifestly erroneous. *People v. Winters*

(1983), 97 Ill. 2d 151, 163, 454 N.E.2d 299, 405.

We begin our analysis with the consent issue since voluntary consent is itself an exception to the warrant requirement, as are, of course, exigent circumstances or hot pursuit. Voluntary consent to search a residence is not limited to proof that consent was given by the defendant, but may be proved by permission to search obtained from a third party who possessed authority over, or other sufficient relationship to, the premises or effects sought to be inspected. The law on third-party consent has been evolving since the decision of the United States Supreme Court in *United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993. In *Matlock*, the Court noted:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States*, 365 U.S. 610, 5 L. Ed. 2d 828, 81 S. Ct. 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7.)

See *People v. Bean* (1981), 84 Ill. 2d 64, 69-70, 417 N.E.2d 608, 611, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106; see generally 3 W. LaFave, Search & Seizure §§8.3, 8.4 (2d ed. 1987); Annot., *Admissibility of evidence discovered in search of defendant's property or residence authorized by defendant's adult relative other than spouse*, 4 A.L.R.4th 196 (1981 & Supp. 1987); Annot., 4 A.L.R.4th 1050 (1981 & Supp. 1987) (consent authorized by nonrelative cotenant or common resident with defendant).

We conclude a proper consideration of the consent issue presented by the facts of this case requires two distinct steps and, further, must be viewed in the context that the police had probable cause to believe the armed robber was in the residence.

■ We first consider whether the teenager exiting the residence

in her bedclothes may be deemed to have authority to permit *the entry* of police to the premises. Professor LaFave has distinguished such a circumstance from that presented in *United States v. Harris* (7th Cir. 1976), 534 F.2d 95, wherein an occasional user of an apartment rented by the defendant consented to a police search of the apartment and to entry through a sliding glass door which he had left unsecured on his last visit, stating:

> "Finally, note must be taken of a case which is quite different from *Harris*, namely, [1] where the guest is actually present inside the premises at the time of the giving of the consent and [2] the consent is merely to a police entry of the premises into an area where a visitor would normally be received. There is sound authority that, at least when the guest is more than a casual visitor and 'had the run of the house,' his lesser interest in the premises is sufficient to render that limited consent effective. It may also be suggested that [3] the apparent authority doctrine may come into play in these circumstances, so that the police are entitled to assume without specific inquiry as to that person's status that one who answers their knock on the door has the authority to let them enter." (3 W. LaFave, Search & Seizure §8.5(e), at 310-11 (2d ed. 1987).)

On this last point, Professor LaFave cited *Nix v. State* (Alaska 1981), 621 P.2d 1347, and in a footnote stated:

> "*Unfortunately, this point is often missed.* See *State v. McGovern*, 77 Wis. 2d 203, 252 N.W.2d 365 (1977) (although court's reasoning obscure, court seems to say consent of person in house to police entry was invalid because, as it turned out, that person was not a co-occupant but instead lived in a tent in the yard). Consider also *People v. Dent*, 371 Ill. 33, 19 N.E.2d 1020 (1939) (police knocked on door of apartment, voice within said 'come in,' police entered and saw tenant and guest with gambling paraphernalia; evidence suppressed absent showing that the voice was that of tenant rather than guest)." (Emphasis added.) (3 W. LaFave, Search & Seizure §8.5(e), at 311 n.106 (2d ed. 1987).)

We conclude the police officer was entitled to assume without specific inquiry that the teenager exiting the house in bedclothes had the authority to permit him to enter.

The Fifth District referred to Professor LaFave's view on third-party consent in *People v. Shaffer* (1982), 111 Ill. App. 3d 1054, 1059, 444 N.E.2d 1096, 1099, and that court concluded the defendant's younger brother, although not "an occupant of indefinite duration,"

was not merely a "casual visitor," and had actual authority to permit police to enter an area where a visitor would normally be received. The *Shaffer* court therefore held the entry of the police into the defendant's residence by police was not unlawful. *Schaffer* also referred to *United States v. Turbyfill* (8th Cir. 1975), 525 F.2d 57, wherein that court upheld third-party consent to enter a residence given by a person who had been staying in the house for several weeks and had "the run of the house." When the police entered, officers found marijuana in plain view in a shoe box on a table. The *Turbyfill* court ruled the officers had a right to be in the position from which they saw the marijuana, describing the person who had admitted the officers as "an occupant of indefinite duration rather than a casual visitor." See also *People v. Fasbinder* (1971), 133 Ill. App. 2d 322, 325, 273 N.E.2d 249, 251 (fact that cotenant's friend opened door did not nullify cotenant's separate consent to search of apartment).

Here, the teenager exiting the house in bedclothes gave Officer Kreiling permission to enter the premises. By our holding, we do not equate this permission to consent to search the premises in its entirety.

■ Given that the police had reason to believe an armed man was in the residence, we conclude that once an officer had permission to enter, it was permissible for the other two officers to enter to the extent that they did here, *i.e.*, to come into the living room of the house. No case has been cited to us, nor do we know of any, which requires that express consent to enter be given each officer when the permission to enter is not expressly limited to the officer to whom it is given.

■ This brings us to the second step of our analysis of the consent issue. Once the other two officers entered the residence, they proceeded to obtain *consent to search* the residence from the occupants in the living room, ascertaining the house belonged to Michelle Brown's grandmother, who was out of town and had asked Michelle to take care of the house in her absence. Michelle Brown was clearly more than a casual visitor and her lesser interest in the premises was sufficient to render consent to search the house effective. By her own testimony she did not exclude defendant's bedroom from the consent she gave officers, nor did she timely retract the consent given.

As stated in *Matlock*, we are not dealing with technical property notions, but whether the third party who granted consent "possessed common authority over *or other sufficient relationship to* the premises or effects sought to be inspected." (Emphasis added.) (*Matlock*,

415 U.S. at 171, 39 L. Ed. 2d at 250, 94 S. Ct. at 993.) As Professor LaFave pointed out, again distinguishing *United States v. Harris* (7th Cir. 1976), 534 F.2d 95:

> "[I]t has been held that where the guest was the married daughter of the hosts and was considered to be in charge of the premises during her parents' temporary absence, the guest's consent was effective. And even when there is not such a family relationship, the guest's consent may suffice if the host was away from the premises for a significant period of time and had left the guest in full charge." (3 W. LaFave, Search & Seizure §8.5(e), at 310 (2d ed. 1987), citing *Garr v. Commonwealth* (Ky. App. 1971), 463 S.W.2d 109, and *Morrison v. State* (Tex. Crim. App. 1974), 508 S.W.2d 827.)

We conclude Michelle Brown had the right to permit the inspection of the premises in her own right during her grandmother's absence.

■ We find persuasive the analysis of third-party consent set forth in *People v. Howard* (1984), 121 Ill. App. 3d 938, 946-47, 460 N.E.2d 432, 438-39:

> "In cases in which it is established that defendant resides with parents or close relatives, and the parents or relatives consent to a search of defendant's bedroom, it should be presumed that there is a common authority over the bedroom sufficient to authorize the consent to search. (See *People v. Daniels* (1971), 16 Cal. App. 3d 36, 43-44, 93 Cal. Rptr. 628, 631-32.) This presumption may be overcome by evidence indicating that defendant had exclusive possession of the searched premises. See *People v. Daniels* (1971), 16 Cal. App. 3d 36, 43-44, 93 Cal. Rptr. 628, 631-32; see also *People v. Nunn* (1973), 55 Ill. 2d 344, 352-53, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608; *State v. Peterson* (Mo. App. 1975), 525 S.W.2d 599, 608-09.
>
> In Illinois, the cases involving third-party consent to search by a parent or relative have focused on whether defendant has established his exclusive possession of the searched premises. (See, *e.g.*, *People v. Stacey* (1974), 58 Ill. 2d 83, 89-90, 317 N.E.2d 24; *People v. Nunn* (1973), 55 Ill. 2d 344, 351-52, 353, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93, 321 N.E.2d 38.) Specifically, two factors indicative of exclusive possession which were noted by the courts in *Stacey*, *Nunn* and *Johnson* were whether [1] the room was locked in defendant's absence and whether [2] defendant gave

explicit instructions not to allow anyone into the bedroom. (See *People v. Stacey* (1974), 58 Ill. 2d 83, 89, [317 N.E.2d 24]; *People v. Nunn* (1973), 55 Ill. 2d 344, 352-53[, 304 N.E.2d 81]; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93[, 321 N.E.2d 38].) Where the evidence fails to establish these two factors, the attack on the third-party consent to search has failed. See *People v. Stacey* (1974), 58 Ill. 2d 83, 89[, 317 N.E.2d 24]; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93[, 321 N.E.2d 38].

In the instant case, the State's evidence established that the Sheats leased the apartment in which defendant resided. The evidence also revealed that defendant had his own bedroom in the apartment which was never locked. There was no evidence that defendant had instructed the Sheats not to enter his bedroom in his absence or that he had left instructions not to allow anyone else into the bedroom. Under these circumstances, we conclude that the Sheats possessed the requisite authority to consent to a search of defendant's bedroom and find that the third-party consent to search in this case was authorized."

On a motion to suppress evidence, the burden of proof is on the defendant to establish that the search and seizure were unreasonable. (*People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899; *People v. Stout* (1985), 106 Ill. 2d 77, 88, 477 N.E.2d 498, 503.) Here, defense counsel questioned the grandmother and Michelle Brown on whether they had *permission* to enter defendant's room in his absence; a lack of permission cannot be equated to *explicit instruction not to enter* and not to let anyone else enter. Even testimony of such explicit instruction would, if believed by the trial court, suffice only to meet the second prong of the test stated in *Howard*.

■ Here, there was no evidence that defendant (1) kept his bedroom locked, or (2) explicitly instructed his grandmother not to enter his bedroom in his absence and not to allow anyone into his bedroom. Under these circumstances, we conclude the grandmother possessed the requisite authority to consent to a search of defendant's bedroom. Since nothing in the evidence shows the grandmother's arrangement with her granddaughter, Michelle Brown, to watch the house in her absence *expressly excluded* defendant's bedroom, we conclude Michelle Brown likewise had the requisite authority to consent to a search of defendant's bedroom as well as the rest of the residence. Defendant simply did not meet the burden of proof on the third-party consent issue.

We find the cases cited by defendant distinguishable. In *People v.*

*Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810, *cert. denied* (1981), 449 U.S. 1127, 67 L. Ed. 2d 115, 101 S. Ct. 948, a landlord purported to consent to a warrantless search of leased premises. In *People v. Bochniak* (1981), 93 Ill. App. 3d 575, 417 N.E.2d 722, *cert. denied* (1982), 455 U.S. 938, 71 L. Ed. 2d 648, 102 S. Ct. 1427, the defendant's mother owned the garage she rented to defendant and retained a key to it, but did not use the garage herself. In *People v. Elders* (1978), 63 Ill. App. 3d 554, 380 N.E.2d 10, the defendant's wife purportedly gave consent to a search of her husband's car. Defendant cites *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512, for the general principle that in order to have authority to grant consent there must be mutual use of the property and joint control and access for most purposes. In *Ford*, the consent search was upheld where the evidence established a mutual use and control of the basement and the wife's right to access to the box of tools in which the evidence was found. The basement was not locked, and the wife was not instructed not to handle the tools. Citing *Stacey*, the *Ford* court stated the mere fact that defendant alone may have used these tools did not indicate his wife was denied the mutual use, access to, or control over them. 83 Ill. App. 3d at 63, 403 N.E.2d at 518.

The trial court did not address the voluntariness of the consent to search, and we have not addressed it since any question on that point is for the trier of fact in the first instance.

Given our holding on the consent issue, we need not go into the hot pursuit and exigent circumstances arguments raised by the State. However, we note that when the teenager opened the door here, the police no longer had the opportunity to knock and announce. In *People v. Masters* (1987), 155 Ill. App. 3d 1015, 1024, 508 N.E.2d 1163, 1169, this court discussed the failure of police to knock and announce their authority and purpose for entering a house and execute a warrantless search. See also *People v. Fonville* (1987), 158 Ill. App. 3d 676, 683-84, 511 N.E.2d 1255, 1260-61.

Accordingly, the judgment of the circuit court quashing the arrest of defendant and suppressing the evidence is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

SPITZ, P.J., and GREEN, J., concur.