THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HORTEZ DANIEL, Defendant-Appellant.

First District (4th Division)   No. 1—91—0845

Opinion filed September 30, 1992.—Rehearing denied December 3, 1992.

---

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Gael O'Brien, Special Assistant State's Attorney, and Renee Goldfarb and Jeanne Lobelson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:
Following a bench trial in the circuit court of Cook County, defendant, Hortez Daniel, was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)); armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2); and residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3). The trial court sentenced defendant to three concurrent prison terms ranging from 15 to 70 years.

Defendant appeals, contending the trial court should have suppressed: (1) his confession, and (2) the fruits of a warrantless search of his car. Defendant also contends (3) his sentence was improper and excessive.

We affirm the judgment of the trial court.

BACKGROUND
The record contains the following pertinent facts. On July 10, 1990, defendant was charged in a 14-count indictment with eight counts of first degree murder, two counts of home invasion, one count of armed robbery, one count of robbery, and two counts of residential burglary.

A
On November 16, 1990, the trial court held a hearing on defendant's motion to suppress statements. The State's evidence was essentially as follows. On June 13, 1990, Chicago police detective Ellen Moran was investigating the murder of Eulis Reese. At approximately 10:30 a.m., as part of the investigation, Detective Moran and other Chicago police officers brought to a police station defendant; his father, Horace; his grandmother, Bernice; his cousin; and Horace's girlfriend. Defendant and his family were taken in two squad cars. Detective Moran could not remember whether defendant was placed in a squad car separate from his family.

At the police station, Detective Moran first questioned Horace's girlfriend. During this time, defendant was with his family. At approximately 12 noon, Moran took defendant to a second-floor interview

room and questioned him for roughly one hour. From approximately 1:30 p.m. to 6:30 p.m., Moran investigated the information that defendant gave to her. She then briefed the next watch assigned to the case.

Chicago police detective George Holmes came on duty on June 13, 1990, at 4:30 p.m. His partner was Detective George Tracy. Defendant was still in the station's second-floor interview room. At approximately 7 p.m., Detective Holmes arrested defendant for the murder of Eulis Reese. At approximately 7:25 p.m., Detective Holmes advised defendant of his constitutional rights and, because defendant was 16 years old, also advised defendant that he could be charged as an adult. Defendant responded that he understood each of his rights. In the room with Detective Holmes was Chicago police department youth officer Carol Kilgore. The door to the room did not lock and defendant was not handcuffed. Defendant agreed to talk with Detective Holmes and they spoke for about an hour. Defendant did not appear upset and was able to answer questions.

At approximately 10 p.m., Detective Holmes again spoke with defendant in the presence of youth officer Kilgore. The conversation lasted for about 10 minutes. Defendant again appeared natural and normal.

Kilgore remained with defendant in the interview room from their 7:25 p.m. conversation until the end of her shift at midnight. Further, neither Kilgore nor anyone in her presence threatened or mentally coerced defendant. Also, defendant did not display any condition that rendered him unable to understand his constitutional rights.

Although Horace remained at the police station throughout the day, Detective Holmes could not recall whether Horace spoke with defendant subsequent to his arrest. However, Horace was allowed to bring defendant food. At approximately 1:30 a.m. on June 14, Horace left the station.

At roughly 2:15 a.m., Detectives Holmes and Tracy spoke with defendant for 10 to 30 minutes. Thereafter, Holmes and Tracy, joined by Detectives Robert Utter and George Carey, took defendant with them on a field investigation. Defendant was handcuffed when they left the station. They went to one location, where they unsuccessfully searched for someone. They thereafter went to a second location, where they unsuccessfully searched for an object.

At approximately 3:30 a.m., the detectives then took defendant to Horace's home. Defendant and the four detectives met with Horace, Horace's girlfriend, and defendant's grandmother. In their presence, defendant made statements that implicated him in the crime. The de-

tectives also recovered evidence from the residence. Defendant made additional statements as he left Horace's residence.

Detectives Holmes and Tracy then took defendant to the home of his friend and high school classmate Sergio Thomas. Detectives Carey and Utter followed. At Thomas' home, the detectives recovered additional evidence. At approximately 4:30 a.m., the detectives took defendant and Thomas back to the police station.

Detectives Holmes and Tracy returned defendant to the second-floor interview room and removed his handcuffs. At approximately 5:15 a.m., the detectives again spoke with defendant. He was again advised of his constitutional rights, to which he again responded that he understood each of his rights. They spoke for roughly 30 minutes. During this conversation, defendant made a confession. The detectives then requested the presence of an assistant State's Attorney.

Throughout the field investigation that morning and during the 5:15 a.m. conversation, each of the four detectives observed that defendant was alert and coherent, responsive and cooperative. Defendant did not appear to have any physical, psychological, educational, or emotional condition that rendered him incapable of understanding and appreciating his constitutional rights. Each detective testified that neither he, nor anyone in his presence, threatened or mentally coerced defendant.

Assistant State's Attorney Aaron Iverson arrived at the police station and spoke with defendant at approximately 7 a.m. Detective Holmes was present at the beginning of the interview. Iverson explained to defendant that he worked with the police and was not defendant's lawyer. Iverson also informed defendant of his constitutional rights. Defendant was not in handcuffs and appeared alert and calm. Defendant and Iverson spoke for roughly one hour. Defendant agreed to repeat his confession in the presence of a court reporter.

Chicago police department youth officer Donald Petersen spoke with defendant at approximately 8:35 a.m. He advised defendant of his constitutional rights and of the possibility that he could be tried as an adult for the offense of murder. Defendant responded that he understood these rights and admonition. Defendant spoke with Petersen for approximately 10 minutes, during which time Detective Moran was in the room periodically. Defendant was not handcuffed. He appeared relaxed and alert, and did not appear to have any physical, mental, educational, or emotional condition that prevented him from understanding his constitutional rights. In response to Petersen's questions, defendant stated that he had eaten and that he was "okay." Neither Officer Petersen nor anyone in his presence threat-

ened or mentally coerced defendant. During this conversation, defendant did not tell Petersen that he had been struck, threatened, or mistreated in anyway by anyone.

Prior to the arrival of the court reporter, defendant went to sleep. When the court reporter arrived, defendant was allowed five or six minutes to wake up. At approximately 9:37 a.m., defendant was again advised of his constitutional rights, and then he repeated his confession, which the court reporter transcribed. With defendant and the court reporter were Iverson, Detective Moran, and youth officer Petersen.

Defendant stated that he was making the confession voluntarily. He had received food, drink, and a cigarette. He was not denied use of the washroom.

However, near the end of the confession, defendant indicated that he had been threatened by a police officer sometime during the early morning. Specifically, a man, using profanity, "threatened to beat [defendant's] head in the wall." Defendant was threatened a total of three times during this encounter. In response to Iverson's questions, defendant stated: he was never actually hit; the person who threatened him was not in the room at that time; the officer did not tell defendant that he had to give the statement or be hit; and that defendant had given the statement voluntarily because "that's what actually happened." Defendant read, made corrections to, and signed the typed statement.

Defendant was the sole defense witness on the motion to suppress. Defendant's testimony was essentially as follows. In cooperation with the police, defendant and his family went to the police station to assist the police in their investigation of the victim's death. When defendant and his family were transported to the police station, he rode in a separate squad car with only the police. Upon their arrival, defendant was taken to a waiting room. He remained in that room throughout the day. He was not handcuffed while he was in the police station.

During the 7:25 p.m. conversation with Detective Holmes and Officer Kilgore, defendant was told that the detectives had recovered a gun from his car. Defendant was further told that Horace identified the gun as the one taken from the victim's home. During the 10 p.m. conversation with Detective Holmes and Officer Kilgore, defendant was told that a friend had seen him with a large amount of money on the day that the victim was killed.

During the early morning of June 14, a police officer entered the interview room. The officer approached defendant, drew a fist near

defendant's face, and told defendant to "sit up. Tell me or I'm going to bust your [expletive] head in the wall." Defendant could not identify this officer, but the officer was one of the detectives that interviewed him and also testified at the hearing.

The four detectives subsequently took defendant on the above-described field investigation. During the investigation, Officer Carey told defendant "don't make us mad, or I'm going to [expletive] you up." After their return to the police station, defendant made a confession because, as he testified, he "was scared" of "Police Officers beating me up." Further, defendant repeated his confession to Assistant State's Attorney Iverson and in the presence of a court reporter for the same reason. The first time defendant alleged that he was threatened was at the end of his court-reported confession. Also, no one ever physically attacked defendant.

At the close of the suppression hearing, the trial court denied defendant's motion to suppress the confession. The court found as follows. Defendant voluntarily went to the police station. He was not under arrest until 7 p.m. Defendant was at the police station for "a substantial length of time." However, police questioning was intermittent rather than continuous. Defendant's family was present at the station "for a substantial period of time" both prior to and following his arrest. Defendant had normal intelligence and prior experience with the police.

The trial court did not find that defendant was threatened. Further, even if defendant was threatened, the threats were not of such a nature as to overcome his will. The court also noted that police substantially complied with the Juvenile Court Act of 1987. (See Ill. Rev. Stat. 1989, ch. 37, par. 801–1 et seq.) Considering the totality of the circumstances, the trial court found that defendant's confession was voluntary and admissible.

## B

On January 7, 1991, immediately prior to trial, the trial court held a hearing on defendant's motion to suppress physical evidence. Defendant sought to suppress a .32 caliber revolver. The police recovered the handgun from the trunk of defendant's automobile as the result of a warrantless search.

The testimony at the hearing was essentially as follows. At approximately 1 p.m. on June 13, 1990, Detective Moran asked for defendant's consent to verify his school attendance records and to search his automobile. Detective Moran testified that defendant gave his consent; he told her that the car was parked in front of Thomas'

home and that Thomas had the car keys. However, defendant testified that Moran did not ask for, and he did not give, his consent to search the car.

Detective Moran then spoke to defendant's father, Horace. Horace told Moran that he had bought the automobile and signed the papers for it. However, there was testimony that title to the car was in defendant's name, Horace drove the car "maybe once," and that defendant drove the car primarily. At Moran's request, Horace signed a consent-to-search form. Moran believed that Horace could consent to the search because defendant was 16 years old and because Horace had paid for the car.

At the close of the hearing, the trial court denied defendant's motion to suppress evidence. The court noted that it was disputed whether defendant consented to the search of the car. The court further noted, however, that it was undisputed that Horace consented. The court found that the police acted in good faith and could reasonably believe that Horace could consent to the search.

## C

The State's case at trial, which included defendant's confession, was essentially as follows. On June 11, 1990, Sergio Thomas rode a motor scooter to his high school. Although the scooter actually belonged to another, Thomas told several classmates, including defendant, that Thomas owned the scooter. Thomas told defendant that the scooter cost roughly $1,800.

On June 12, defendant was at school between 8:30 a.m. and 9 a.m. Later that day, he went to the victim's apartment. The victim was 77 years old. He was the boyfriend to defendant's grandmother; he was regarded as a stepfather by Horace. The victim lived with defendant's grandmother and cousin. In the victim's apartment, Horace kept approximately $3,600 and a .32-caliber revolver in a suitcase in a closet.

Defendant spoke with the victim for a few minutes. Defendant then grabbed the victim from behind and choked him; defendant used his forearm in a "full Nelson" hold. The victim passed out and defendant placed him on the kitchen floor.

Defendant found the suitcase containing the money and the handgun. He returned to the kitchen and placed them both on the kitchen table. Defendant also loaded the handgun and laid it on the table. The victim stirred. Defendant took a kitchen knife, put one hand over the victim's mouth, and attempted to stab the victim. However, defendant cut himself during the ensuing struggle.

Defendant took the gun and ordered the victim to stand up and be quiet. Defendant then went into the living room to see whether anyone was coming. The victim attempted to escape down the back stairs of the building. Defendant returned to the kitchen and chased the victim. Defendant shot at the victim twice as he ran down the stairs, from a distance of eight or nine feet. Defendant shot at the victim a third time as he ran toward his car. Defendant then took the money and ran in the opposite direction of the victim.

Defendant hid the money behind his school and hid the gun behind a house. He eventually picked up his car, retrieved the money and the gun, and drove to his high school to meet Thomas.

At approximately 2:45 p.m., defendant and Thomas drove to Thomas' home. Thomas noticed that one of defendant's thumbs was bandaged and bloody. When they arrived, defendant placed the gun in the back of the car beside the spare tire, telling Thomas that he had to hide it. Defendant took the money to Thomas' room, where defendant counted $2,000. Thomas gave defendant a black waist sack in which defendant put the $2,000. Thomas hid the remainder in his mattress. Defendant did not tell Thomas how defendant acquired the money.

Defendant and Thomas returned to defendant's car. Defendant unloaded the gun and replaced it beside the spare tire. Thomas drove defendant's car to an automobile dealer to buy a scooter. On the way to the dealer, defendant threw the bullets onto the street. They eventually arrived at the dealership, where defendant bought a scooter for $1,820. Thomas signed the papers and the scooter was placed in his name because defendant was too young.

Defendant drove the scooter and Thomas drove defendant's car back to Thomas' home. Defendant gave Thomas his car keys and said that he would return that night or the next day. Thomas advised defendant not to carry the gun while driving the scooter. Thomas took the remainder of the money from his mattress and hid it in a tool box under his desk.

At approximately 12:45 p.m. on June 12, Detective Moran was assigned to investigate the homicide. She noticed a pool of blood where the victim was found, roughly 50 to 60 feet from the building's back stairs leading to the victim's apartment. There were bloody footprints on the stairs, another pool of blood on the kitchen floor, and blood on the kitchen cabinets and the back door knob. They found the victim's pants, inside of which was a wallet containing approximately $70. The parties stipulated that the victim died of two gunshot wounds.

Through her investigation, Detective Moran met the family of the victim and that of defendant. Horace told Moran that money and a gun were missing from the victim's apartment.

As we recounted earlier, on June 13, defendant and his family were taken to the police station. That afternoon, Detective Moran received the consent of both defendant and Horace to search defendant's car. At approximately 3:30 p.m., Detective Moran went to Thomas' home. Thomas gave the car keys to Moran, who found the revolver near the spare tire. The parties stipulated that the handgun was the instrument of death.

When the detectives and defendant went to Horace's home on June 14 at 3:30 a.m., they recovered the black waist sack. It contained roughly $130. Also, when the detectives and defendant thereafter went to Thomas' home, they recovered the remainder of the stolen money.

At the close of the State's case, the trial court granted defendant's motion for an acquittal on the two counts of home invasion and the two counts of murder based on the home invasion. Presenting no witnesses, the defense rested.

The trial court convicted defendant of first degree murder. The court convicted defendant of armed robbery and further found that the charge of robbery merged into the armed robbery conviction. The court also convicted defendant of residential burglary.

At the sentencing hearing, the trial court denied defendant's post-trial motion. At the close of the hearing, the trial court found that the victim's age was an aggravating factor that qualified defendant for an extended prison term. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.2(b)(3)(ii), 1005—8—2(a).) The court sentenced defendant to three concurrent prison terms of 70 years on the murder conviction, 20 years on the armed robbery conviction, and 15 years on the residential burglary conviction. Defendant appeals.

OPINION

I

Defendant first claims that the trial court should have granted his motion to suppress statements. Defendant contends that his confession was involuntary.

The test for determining the voluntariness of a defendant's statement is quite settled. "The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he con-

fessed." *People v. Jones* (1990), 196 Ill. App. 3d 937, 957, 554 N.E.2d 516, 528; see *People v. Hattery* (1989), 183 Ill. App. 3d 785, 821, 539 N.E.2d 368, 392.

The question of whether a confession is a product of free will must be answered on the facts of each case because no single fact is dispositive. In determining whether a defendant gave statements voluntarily, a court may consider many factors, which include: the defendant's age, intelligence, background, experience, mental capacity, and education, and physical condition at the time of questioning; the legality and duration of the detention; and any physical or mental abuse by police, including the existence of threats or promises. The trial court's finding that a statement was voluntary will not be disturbed on review unless it is against the manifest weight of the evidence. In reviewing the trial court's finding, we may consider the entire record, including trial testimony. *Jones*, 196 Ill. App. 3d at 957, 554 N.E.2d at 528; *Hattery*, 183 Ill. App. 3d at 821, 539 N.E.2d at 392-93.

Further, this test applies to both juvenile and adult confessions. However, courts recognize that the making of an incriminating statement by a juvenile is a sensitive concern that requires great care, in the absence of counsel, to assure that the admission was neither coerced nor suggested, nor the product of ignorance of rights, fright, or despair. (*Jones*, 196 Ill. App. 3d at 957, 554 N.E.2d at 528.) For the following reasons, we uphold the trial court's finding of voluntariness.

## A

Defendant assigns error to the trial court's findings that defendant freely and voluntarily went to the police station on June 13, 1990, at 10:30 a.m. and that he was not under arrest until 7 p.m. Rather, defendant contends that his confession was the result of an illegal detention that began at 10:30 a.m.

Police must have probable cause to believe that a person committed a crime in order to detain that person involuntarily for purposes of interrogation. The test to determine whether a person has been detained for custodial interrogation is whether a reasonable, innocent person in the circumstances would believe that he was free to leave. The test is objective; therefore, defendant's belief that he was under arrest is not determinative. *People v. Finklea* (1983), 119 Ill. App. 3d 448, 451-52, 456 N.E.2d 680, 682; *People v. Reed* (1982), 104 Ill. App. 3d 331, 335-36, 432 N.E.2d 979, 982-83.

As with the general issue of voluntariness, a court must look to all of the circumstances surrounding the questioning, with no single

factor deemed controlling. The factors include: the place of interrogation, any statements or conduct that indicate that the accused is not free to leave, the extent of the knowledge of the police and the focus of their investigation, and the intentions of police officers in questioning the accused. A court should also consider the time, length, mode and mood of the interrogation; the number of police officers present and the presence or absence of the accused's friends or family; the manner in which the accused arrived at the interrogation site; and the age, intelligence, and mental makeup of the accused. *People v. Matthews* (1990), 205 Ill. App. 3d 371, 402-03, 562 N.E.2d 1113, 1131-32, quoting *People v. Smith* (1986), 150 Ill. App. 3d 524, 528, 501 N.E.2d 1010, 1013; *Finklea*, 119 Ill. App. 3d at 452, 456 N.E.2d at 682.

Further, the facts that the questioning took place in a police station and that police drove the defendant to the station, considered either individually or in combination, are not sufficient to convert the questioning into an arrest. Also, the fact that police suspicions may have shifted during the course of the interrogations does not render the situation custodial. *Finklea*, 119 Ill. App. 3d at 453, 456 N.E.2d at 682.

■ Applying these factors to the case at bar, we conclude that defendant's confession was not the result of an illegal detention. Defendant himself testified that he and his family were taken to the police station to cooperate with the police and to assist in the investigation of the victim's homicide. The record does not show that the police had at that time focused their investigation on defendant.

True, defendant's pre-arrest interrogation period lasted from 10:30 a.m. until 7 p.m. However, at least Horace was present throughout the interrogation period. Further, defendant was questioned only once, by only Detective Moran, and for only one hour. Defendant was not restrained in any way; he was not placed in a locked room; he was not told that he was not free to leave. We cannot say that the trial court's findings, that defendant freely and voluntarily went to the police station on the morning of June 13, 1990, and that he was not under arrest until 7 p.m., were against the manifest weight of the evidence.

### B

■ Defendant next assigns error to the trial court's finding that defendant was advised of his constitutional rights (see *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) on "many, many occasions." Rather, defendant points to the fact that he was first advised of his constitutional rights at 7:25 p.m., approxi-

mately nine hours subsequent to his arrival at the police station. However, defendant came to the police station voluntarily and was not in custody until his arrest at 7 p.m. Therefore, *Miranda* warnings were not required. See *Finklea*, 119 Ill. App. 3d at 453-54, 456 N.E.2d at 683.

Defendant also points to the fact that he was not readmonished until 5:15 a.m., approximately 10 hours subsequent to his first admonishment, and that he made incriminating statements in the interim. However, once an accused is advised of the *Miranda* warnings and acknowledges his understanding of them, the voluntariness of subsequent statements is not compromised by failure to repeat the warnings at each successive interview. (*People v. Hill* (1968), 39 Ill. 2d 125, 131-32, 233 N.E.2d 367, 371; *People v. Genus* (1979), 74 Ill. App. 3d 1002, 1011, 393 N.E.2d 1162, 1169.) We note that defendant was advised of his rights on several additional occasions prior to giving a transcribed confession. We cannot say that the trial court's finding was against the manifest weight of the evidence.

## C

Defendant assigns error to the trial court's findings regarding alleged threats made by a police officer. The trial court did not find that defendant was threatened. Further, the court did find that even if defendant was threatened, the threats were not of such a nature as to overcome his will.

The trial court applied the correct analysis. As we stated earlier, the test of voluntariness is based on all of the circumstances surrounding the making of the statement. No one factor is dispositive. "It is possible that, although threats or promises may have been made, the evidence as a whole shows that a statement was made voluntarily and is therefore admissible in evidence." (*People v. Jones* (1972), 8 Ill. App. 3d 849, 853, 291 N.E.2d 305, 308.) It was within the province of the trial court to judge the credibility of defendant and the other witnesses. (See *Jones*, 196 Ill. App. 3d at 960, 554 N.E.2d at 530.) We cannot say that the trial court's finding was against the manifest weight of the evidence.

## D

Defendant next assigns error to the trial court's finding that there "was clearly no evidence of any physical abuse in this case." Defendant characterizes the following facts as "incidents of abuse": he was given food only once during the interrogation period; he was isolated in a small room with no sleeping facilities; he was given

something to drink only once; and police officers interrupted what sleep he obtained to interrogate him.

We uphold the trial court's finding. The fact that the interview room lacked comfortable furnishings does not indicate that defendant was coerced into making his confession. "The mere existence of some discomfort is not sufficient to render a statement involuntary." (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 402, 495 N.E.2d 984, 991.) Indeed, defendant never testified that he was hungry, thirsty, tired, or denied access to the washroom. We cannot say that the trial court's finding was against the manifest weight of the evidence.

## E

Defendant next assigns error to the trial court's finding that the police substantially complied with the Juvenile Court Act of 1987. (See Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*) However, the Act does not apply to defendant. "Defendant in the instant case was not arrested pursuant to a petition in the juvenile court, but was simply arrested for murder and was therefore subject to the jurisdiction of the criminal courts." *People v. Visnack* (1985), 135 Ill. App. 3d 113, 126, 481 N.E.2d 744, 753.

Defendant also assigns error to the trial court's finding that defendant had prior experience with police. However, this is an accepted factor in the totality of the circumstances which a court should consider. *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132, 476 N.E.2d 1179, 1185.

We have carefully reviewed the entire record. In view of all of the circumstances surrounding defendant's confession, we cannot say that the trial court's finding, that defendant voluntarily made the confession, was against the manifest weight of the evidence.

## II

Defendant next claims that the trial court should have granted his motion to suppress evidence. He contends that the police did not receive a valid consent to search his car. Defendant argues that the illegal search produced not only Horace's revolver, but also defendant's further inculpatory statements, additional physical evidence and, ultimately, defendant's confession.

On a motion to suppress evidence, the burden of proof is on the defendant to establish that the search was unreasonable. (*People v. Brown* (1987), 162 Ill. App. 3d 528, 540, 515 N.E.2d 1285, 1292.) A trial court's determination on a motion to suppress will not be over-

turned unless it is manifestly erroneous. *Brown,* 162 Ill. App. 3d at 535, 515 N.E.2d at 1289.

Under the fourth and fourteenth amendments to the United States Constitution, a search conducted without a search warrant is *per se* unreasonable. An exception to the requirements of a search warrant and probable cause is a search that is conducted pursuant to consent. (*People v. Callaway* (1988), 167 Ill. App. 3d 872, 877, 522 N.E.2d 337, 340; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 891, 321 N.E.2d 38, 42-43.) To be valid, the consent must be freely and voluntarily given. Whether a consent is voluntary is a question of fact to be determined from all of the circumstances. *Callaway,* 167 Ill. App. 3d at 877, 522 N.E.2d at 340.

█ In the present case, the trial court based its ruling on the undisputed fact that Horace consented to the search. It is axiomatic that consent to a search must be voluntary. It is further settled that consent need not be given by the defendant. "Rather, any person who has access to or control of the property for most purposes has authority to consent to a search, and the evidence seized during the search may be used against defendant." *People v. Bolden* (1987), 152 Ill. App. 3d 631, 635, 504 N.E.2d 835, 839, cited in *People v. Harris* (1990), 199 Ill. App. 3d 1008, 1013, 557 N.E.2d 1277, 1280.

The authority that justifies third-party consent is not based on the law of property, but is based rather on mutual use of the property by persons generally having joint access or control for most purposes. Therefore, it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right, and that the others have assumed the risk that one of their number might permit the common area to be searched. *Brown,* 162 Ill. App. 3d at 536, 515 N.E.2d at 1290, quoting *United States v. Matlock* (1974), 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7.

A corollary to the concept of common authority applies when a parent gives a third-party consent to search the property of a minor. It is reasonable to recognize that "a parent may consent to a warrantless search of his [or her] minor child's property as a part of the parent's right and duty to exert parental authority and control over minor children." (Annot., 4 A.L.R.4th 196, 204 (1981).) This court has specifically held as follows:

> "We believe that there is implicit in the rights and duties imposed upon a parent, the right to exert parental authority and control over a minor son's [or daughter's] surroundings ***." *In re Salyer* (1977), 44 Ill. App. 3d 854, 859, 358 N.E.2d 1333, 1336.

Additionally, our supreme court has recently held as follows:

"But this court has not decided what standard the alleged consent has to meet or whether the consent needs to be unequivocal and specific. We now hold that, when a court is deciding whether consent was given (not whether that consent was voluntary), the circumstances must have been such that the police could have reasonably believed they had been given consent to enter." *People v. Henderson* (1990), 142 Ill. 2d 258, 299, 568 N.E.2d 1234, 1254, citing *Illinois v. Rodriguez* (1990), 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793.

Applying these principles to the present case, we uphold the trial court's denial of defendant's motion to suppress evidence. Detective Moran believed that Horace could consent to the search of the car because defendant was 16 years old and because Horace paid for the car. After considering the totality of the circumstances, the trial court found that the police acted in good faith and could reasonably believe that Horace could consent to the search. We cannot say that the trial court's determination was manifestly erroneous. See, *e.g., State v. Braxton* (1978), 294 N.C. 446, 465, 242 S.E.2d 769, 780; *State v. Dhaemers* (1967), 276 Minn. 332, 338, 150 N.W.2d 61, 65.

### III

Defendant lastly claims that his prison sentence of 70 years was improper and excessive. It is true that Supreme Court Rule 615(b)(4) authorizes this court to reduce a criminal sentence. (134 Ill. 2d R. 615(b)(4).) However, a sentencing decision is a matter of judicial discretion and, so long as the sentence is within the statutory limits, we hesitate to exercise our power to reduce it absent a finding that the trial court exceeded its discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.

### A

Defendant argues that the 20-year sentence on the armed robbery conviction should be vacated because "the acts on which the armed robbery conviction was based represent a segment in a rapid succession of events leading to the murder."

It is established " 'that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered.' " (*People v. Myers* (1981), 85 Ill. 2d 281, 287-88, 426 N.E.2d 535, 538, quoting *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845.) "As long as there are multiple acts as de-

fined in *King*, their interrelationship does not preclude multiple convictions and the imposition of concurrent sentences based upon them." *Myers*, 85 Ill. 2d at 288, 426 N.E.2d at 538.

■ In the case at bar, defendant had already committed the offense of armed robbery when he committed the separate offense of murder. Defendant repeatedly shot at the victim as he attempted to escape. This act occurred after defendant robbed, stabbed, and threatened the victim with a gun. We conclude that defendant was properly charged with the separate offenses of murder and armed robbery. See, *e.g., People v. Withers* (1976), 38 Ill. App. 3d 77, 80, 347 N.E.2d 393, 396; *People v. Thompson* (1972), 3 Ill. App. 3d 684, 690, 278 N.E.2d 1, 6.

■ Defendant also argues that the 15-year sentence on the residential burglary conviction should be vacated because "the trial court merged the residential burglary with the murder charge." Defendant misreads the record. The record shows that the trial court convicted defendant of murder, armed robbery, and residential burglary. The court found that the robbery charge merged into the armed robbery conviction. The record does not contain any reference whatsoever to a merger of the residential burglary charge into any other offense. We cannot say that the trial court exceeded its discretion on this issue.

B

Defendant next argues that his 70-year, extended-term sentence is disproportionate when compared against: (1) "sentences imposed for murder on other youthful defendants," (2) "other murders for which a lesser term has been imposed," (3) "the terms imposed for murder convictions based on similar facts," and (4) "sentences imposed by the same judge for murders containing equal or greater aggravation."

This court has previously rejected such a "proportionality" argument. We observed:

> "Initially, we note that persons who commit crimes independently are seldom, if ever, similarly situated. Furthermore, it would be a futile act to require a sentencing court to consider the sentences previously imposed on other defendants who were convicted of a particular type of crime ***." (*People v. Conaway* (1981), 101 Ill. App. 3d 202, 204, 427 N.E.2d 1302, 1304.)

The trial judge is normally in a better position to determine punishment than a reviewing court. A trial judge properly bases a sentence on the particular circumstances of each individual case, including the defendant's credibility, demeanor, general moral character, mentality,

social environment, habits, and age. The trial judge has the superior opportunity to consider these factors; we have before us only the cold record. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

■■■ After reviewing the record in the present case, we cannot say that the trial court exceeded its discretion. The 70-year extended sentence was within the statutory range. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.2(b)(3)(ii), 1005—8—2(a).) The record shows that the trial court considered many different factors prior to imposing sentence. We hold that defendant's extended sentence of 70 years was proper and not excessive.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.