THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL ARNA, Defendant-Appellant.

First District (2nd Division)   No. 1—92—0687

Opinion filed May 17, 1994.—Rehearing denied June 16, 1994.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eric Lifvendahl, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Following a bench trial, defendant Daniel Arna was convicted of

two counts of attempted first degree murder and was sentenced to the custody of the Department of Corrections for concurrent terms of 30 and 45 years, respectively. On appeal, defendant contends that (1) he was denied his constitutional right to the effective assistance of counsel; (2) the State failed to prove him guilty beyond a reasonable doubt; and (3) the circuit court erred in denying his *pro se* motion to reduce sentence without first appointing counsel to represent him.

At trial, the following evidence was presented. Tonya Parks testified that she had lived with Darren Newell for approximately two years and that he was the father of her two oldest children, Whitney (three years old at the time of trial) and Porchia (one year old at the time of trial). After leaving Newell, she moved in with her mother for a short period and then began living with defendant, who was the father of her youngest child, Terrell (three months old at the time of trial). On June 14, 1990, she left defendant because he would argue with and spank Whitney. Although some time prior to her leaving defendant had threatened to kill her if she left him, on the day she left, he merely told her that he did not think it was a good idea for her to go to her mother's house. After leaving defendant, Parks resided with Newell at his sister's house.

On June 20, 1990, at about 11 a.m., she and Newell took Whitney and Porchia to the currency exchange at 422 East 61st Street in Chicago to pick up her public aid check, as she had done the previous month with defendant. Five or six other people were inside the currency exchange. She and Whitney waited in line while Newell stood off to the side holding Porchia. After she received her check from the clerk, she went to the table and began opening the envelope when she noticed defendant standing near the door to the currency exchange. Defendant then removed a gun from his pants and pointed it at her. She ducked as defendant fired three or four shots, striking her once in the chest and Whitney twice in the head. Defendant then left the currency exchange. Newell chased after him, but came back to take Parks and Whitney to the hospital.

On the way to the hospital, they stopped a police officer and Parks reported that they had been shot by defendant. She and Whitney were then taken to Cook County Hospital, where they both underwent surgery. She remained in the hospital for approximately three days; Whitney was hospitalized for two weeks. Her bullet was not removed; she still has a scar where she was struck on the left side of her chest.

Following the shooting, defendant called Parks on the phone and she visited him in the county jail. In May 1991 defendant asked her to write a letter and told her what to say. The letter stated:

"Dear Daniel

Hi I'am [sic] sorry that I put you through all of this trouble. But however I was coherst [sic] by certain persons in which I said that you was the one, [sic] who shot us. When your court date comes I will be there to tell the gosple [sic] truth of what happen. [sic] Him [sic] and I know it was someone else, but I was mad at you at the time it took place.

Love
Tonya

P.S. I am sorry, sorry, sorry, and I still love you very much. Also I had you a son."

In June 1991, after defendant asked her to fill out an affidavit, she went to his sister's house and his sister, Patricia Wilson, wrote out the affidavit and gave it to her. She then went to a currency exchange where she signed the affidavit and had it notarized. The affidavit stated:

"I, Tonya Parks, hereby state that all the following information is true and factual:

On June 20th I, Tonya Parks and my baby Whitney Newell was shot in the Currency Exchange. The Police came to the hospital while I was under medication and showed me a picture of Daniel Arna and told me he turned hisself [sic] in and they told me to say it was him that shot me and my baby Whitney Newell so I did. I said that because they told me to. When I came to court the State Attorney told me everthing [sic] to say and how to say it. State Attorney also told me if I did not say it was Daniel that shot me and my baby Whitney Newell they would take my children so I said everything they said. I know it was not Daniel that shot me and my baby Whitney Newell Daniel never came in that Currency Exchange I saw the man that shot me and my baby and it was not Daniel. Darren said it was Daniel and he knew it was not Daniel that did it.

I, the undersigned, under penalty of perjury, state that all the aforementioned is true and factual.

/s/ Tonya Parks 6-12-91."

Parks stated that the statements in the letter and the affidavit were not true.

At the end of Parks' direct testimony, Whitney was brought into the courtroom and Parks indicated the location of Whitney's bullet wounds. The court also noted for the record that Whitney smiled and waved at defendant, who waved back.

On cross-examination, Parks stated that she had called defendant's attorney numerous times, that the attorney had called her three times, and that they had spoken only twice. One of those times,

the attorney told her to contact the State's Attorney's office. She then informed the State's Attorney's office that she did not want to prosecute the case and that defendant was not the person who shot her. She also stated that she sent a $30 money order to defendant along with the May 1991 letter, and that she sent him one other letter and three cards, and spoke with him on the telephone many times. She stated that she did not know what the word "perjury" meant until after she signed the affidavit when defendant told her that it meant the State "would try to lock [her] up." She also stated that before she left him, Newell had tried to kill her and that he had written her letters threatening to do so. She stated that Newell and defendant had seen each other once, but that Newell did not know defendant's name nor had Newell seen his children while she was living with defendant. Defendant never beat her or her children, other than spanking Whitney, but he did threaten her once with a gun. Finally, she said that she was lying when she signed the affidavit, but was telling the truth at trial.

Darren Newell testified for the State that on June 20, 1990, he was at the currency exchange with Parks and their two daughters to cash Parks' public aid check. No one else was in the currency exchange. While Parks went to the cashier with Whitney, he stood about six feet away and held Porchia in his arms. The door was to the right of where he was standing, and he had his back to the window. When he heard two gunshots, he turned and saw defendant standing in the doorway, pointing a gun at Whitney. Whitney fell to the floor and began crying and, as Parks reached for Whitney, a third shot hit Parks, causing her to fall back against the wall. He then put Porchia down and ran after defendant, but when defendant ran into an alley, he returned to the currency exchange in order to take Parks and Whitney to the hospital. On their way to the hospital, he saw a police officer writing a ticket. He stopped and told the officer that his girl friend and daughter had been shot. The officer then called for backup and an ambulance and Parks and Whitney were taken to Cook County Hospital. He then told the other officers what had happened and gave them defendant's first name, but was unable to give them his last name.

Later that evening, he went to the police station where he viewed a lineup and identified defendant as the man who shot Parks and Whitney. He stated that he had met defendant only once before, in May of 1990, when he ran into him and Parks on the street.

David Williams testified that he had just left a store at 412 East 61st Street at approximately 11 a.m. on June 20, 1990, and was talking with a friend when he heard three shots. As he ducked into a

doorway, he saw a man with a gun run past him and into an alley. He explained that he could not identify the man he saw run past him because at the time he focused on the gun and only caught a glimpse of the man.

Michelle Lee testified that she was Darren Newell's sister and that he and Parks, who had moved in about one week earlier, were living with her at the time of the events in question. On June 17, 1990, Father's Day, defendant came to her house looking for Parks. When she told him that Parks was not there, he began arguing with her. She then noticed that he had a gun in his waistband.

On cross-examination, Lee stated that her encounter with defendant may have occurred on Saturday, June 16, rather than on Sunday, June 17.

Chicago police officer Edgar Anderson testified that on June 20, 1990, at approximately 11 a.m., he received a radio report that people had been shot at a currency exchange at 422 East 61st Street. Upon arriving at that location, he received another report that the injured persons were at 63rd Street and Vernon Avenue. At that location, he found a brown Cadillac double parked with Parks and Whitney sitting in the front seat. Parks was bleeding from her chest and Whitney was bleeding from her head. He then asked Parks if she knew who shot her, and she replied that "it was [her] ex-boyfriend Daniel." She also told him the last name, which sounded like "Amore." After Parks and Whitney were taken to the hospital by ambulance, the police tried to find defendant at the address Parks had given them but were unable to do so.

Chicago police detective James O'Leary testified that as part of his investigation into the shooting, he interviewed defendant at the police station at approximately 4:45 p.m. on June 20, 1990. Defendant told him that he met Parks in January 1990, and that shortly after that, they began living together. While they were living together, they continually argued over defendant's treatment of Whitney and, about one week earlier, Parks had left the apartment with the children. Defendant admitted that he would occasionally spank Whitney, but he did not believe that he was ever abusive. In an attempt to speak with Parks, defendant said that he went to Lee's house but got into an argument with Lee.

Defendant also told O'Leary that he went to the currency exchange that day because he knew that Parks would be there to cash her public aid check. When defendant arrived, he saw Parks, Newell, and the two children, but when he tried to enter, "some unknown person knocked him out of the way and began shooting." Defendant then ran to his apartment. Defendant could not identify the

person and did not even know if it was a man or a woman. Later that afternoon, defendant learned that he was wanted for the shooting while watching television. He then contacted a news reporter and arranged for his surrender.

On cross-examination, O'Leary stated that Lee never told him that defendant had a gun when he spoke to her about the argument.

The State introduced nine photographs into evidence and then rested. Defendant introduced into evidence the letter Parks had sent to defendant and the affidavit that she signed. Defendant then rested.

Following closing arguments, during which defendant's counsel argued that no credible evidence was presented that showed defendant was the person who shot Parks and Whitney at the currency exchange, the court found defendant guilty of attempted first degree murder of both Parks and Whitney. The court stated:

"I have listened carefully to all the witnesses who have testified. I have reviewed all of the items moved into evidence including [the letter and affidavit] authored by Ms. Parks. And though it is very clear that she has changed positions on several occasions, the evidence has clearly established that the presence of [defendant] at the currency exchange on June 20, the immediate identification of him shortly after the incident, although there was [sic] some questions in terms of not being absolutely consistent, the testimony of Mr. Newell, but I find based upon his testimony that he had an opportunity to view the person who did in fact do the shooting unobstructed in a very small area, in a well-lit area because it happened at 11:00 in the morning.

The photographs of the currency exchange which I have viewed, has glass on the front, so not only is there the opportunity to view within the currency exchange, but outside. Additionally the testimony of detective O'Leary who puts [defendant] at the currency exchange, I find that he was in fact present. The indications that he gave to Detective O'Leary that someone else pushed him aside and did the shooting I find to be completely without belief.

And therefore, I think that the evidence has established without any doubt that [defendant] was there and did fire the shots which caused the injury to Ms. Parks and to the child Ms. Newell.

I would, just so the record is very clear, with regard to Ms. Michelle Lee, I considered that evidence for its corroborative benefit in that it establishes that [defendant] was in fact looking for Ms. Parks. The fact as to whether or not he had a gun, I do not find that evidence compelling in that the gun was not used during the incident, and it was only based on the testimony of her sighting something in the back which may or may not have been

a gun. But at least establishes [*sic*] the testimony that [defendant] was in fact looking for Ms. Parks[,] one of the victims, and that is corroborated by his own statement to Detective O'Leary."

Thereafter, a sentencing hearing was held during which a woman testified in aggravation that she had been raped by defendant at gunpoint in 1983. Following arguments in aggravation and mitigation, the circuit court sentenced defendant to an extended term of 45 years' imprisonment for the attempted first degree murder of Whitney Newell and 30 years' imprisonment for the attempted first degree murder of Tonya Parks. The sentences were to run concurrently. Defendant subsequently filed a *pro se* motion to reduce sentence, alleging that the sentence he received was greater than the one offered to him as part of a pretrial plea bargain. The court denied the motion without argument, stating that although "[a] substantial penitentiary term was offered," additional information regarding defendant's conduct was made available during the trial which justified the lengthier sentence.

■ On appeal, defendant first contends that his trial counsel was constitutionally ineffective because he failed to use Parks' prior inconsistent statements as substantive evidence. He asserts that although the attorney did introduce them into evidence and the court stated that it had reviewed them, the failure "to urge the consideration of these prior inconsistent statements as substantive evidence" denied him a fair trial because it resulted in a "*de facto* limitation" of the evidence to impeachment purposes only. In response, the State asserts that defendant has waived this issue by failing to object at trial or include the issue in his post-trial motion. In the alternative, the State argues that defendant is unable to demonstrate that he has been prejudiced by the alleged deficiency.

Before addressing the merits, we first reject the State's waiver argument because "issues concerning the sufficiency of the evidence and the alleged ineffective assistance of counsel are recognized exceptions to the waiver rule." *People v. Lopez* (1993), 242 Ill. App. 3d 160, 162, 610 N.E.2d 189.

Nevertheless, the State correctly points out that defendant is unable to demonstrate any prejudice as a result of the alleged deficiency. In order to establish a claim of ineffective assistance of counsel, a defendant must first establish that his counsel was constitutionally deficient; that the "errors [were] so serious that counsel was not functioning as the 'counsel' guaranteed *** by the Sixth Amendment." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The inquiry is simply " 'whether counsel's assistance was reasonable considering all

the circumstances.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061, quoting *Strickland,* 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) A defendant must also establish that "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Due to interests of judicial economy, a court may first determine whether or not a defendant has suffered any prejudice as a result of the alleged deficiency before ever determining that one actually exists. *People v. Caballero* (1989), 126 Ill. 2d 248, 260-61, 533 N.E.2d 1089.

In the instant case, defendant contends that his counsel was ineffective in failing to argue to the court that Parks' prior statements that someone other than defendant had shot her and Whitney constituted substantive evidence under section 115—10.1 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.1 (now 725 ILCS 5/115—10.1 (West 1992)); *People v. Orange* (1988), 121 Ill. 2d 364, 381, 521 N.E.2d 69, *cert. denied* (1988), 488 U.S. 900, 102 L. Ed. 2d 235, 109 S. Ct. 247 (upholding the constitutionality of section 115—10.1).) Defendant cites *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 501 N.E.2d 863, *appeal denied* (1987), 114 Ill. 2d 556, 508 N.E.2d 735, for the proposition that failure to inform the finder of fact that prior inconsistent statements may be used as substantive evidence rather than simply for impeachment purposes constitutes ineffective assistance of counsel. In *Wilson,* the defendant's trial counsel failed to tender a jury instruction based on the then recently enacted statute authorizing the use of prior inconsistent statements as substantive evidence. Instead, the attorney submitted an instruction which directed the jury to consider the complaining witness' prior inconsistent statements " 'only for the purpose of deciding the weight to be given the testimony.' " (*Wilson,* 149 Ill. App. 3d at 1078, quoting Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981).) The appellate court held that the failure to recognize the substantive value of the evidence and argue it to the jury constituted ineffective assistance of counsel because it "deprived [the] defendant from having [an] essential element of his defense clearly explained and emphasized to the jury." *Wilson,* 149 Ill. App. 3d at 1079.

Although it is true that an attorney's conduct may be deficient when he fails to tender an instruction that prior inconsistent statements can be considered substantively, that alone does not violate a defendant's sixth amendment right to be represented by

effective counsel; the deficiency must also result in prejudice to the defendant so that the result of the proceeding would have been different. (*People v. Faircloth* (1992), 234 Ill. App. 3d 386, 394, 599 N.E.2d 1357, *appeal denied* (1993), 148 Ill. 2d 647, 610 N.E.2d 1269 (holding that the defendant was not denied the effective assistance of counsel because the result of the trial would not have been different even if the jury had been instructed to use the prior inconsistent statements substantively).) Defendant here can make no such showing.

The record reveals that defendant's counsel successfully offered the statements into evidence and the court expressly stated that it reviewed them. Thus, even if it were deficient to fail to argue the substantive value of the statements, both the letter and the affidavit were actually introduced into evidence, but were rejected by the finder of fact. Unlike *Wilson*, this was a bench trial, and the trier of fact was not deprived of a necessary consideration.

Whether the letter and the affidavit had substantive value or merely impeachment value, their real benefit was to cast doubt upon Parks' testimony and, by implication, that of Newell. Because the circuit court stated that it found both Parks' and Newell's trial testimony credible and that it found defendant's statement to Detective O'Leary that someone pushed him out of the way and began shooting into the currency exchange "to be completely beyond belief," defendant is unable to demonstrate any prejudice and thus was not denied the effective assistance of counsel.

■ Defendant next contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. He maintains that because no credible evidence corroborated Parks' and Newell's "contradictory and basically incredible testimony," he was not proved guilty beyond a reasonable doubt.

A reviewing court will not set aside a conviction on the ground of insufficient evidence unless "the evidence is so palpably contrary to the verdict or judgment that it is unreasonable, improbable or unsatisfactory and thus creates a reasonable doubt of guilt." (*People v. Witherspoon* (1991), 216 Ill. App. 3d 323, 333, 576 N.E.2d 1030.) A circuit court's determination will be reversed on appeal only if the reviewing court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) The reviewing court cannot, however, "second-guess the trier of fact's evaluation of the credibility of the witnesses, the weight to be given

their testimony, and the inferences to be drawn from the evidence." *People v. Murray* (1990), 194 Ill. App. 3d 653, 656-57, 551 N.E.2d 283; see also *People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837, *cert. denied* (1991), 502 U.S. 853 116 L. Ed. 2d 125, 112 S. Ct. 161.

In the instant case, the State presented the testimony of two eyewitnesses who identified defendant as the shooter. Furthermore, defendant's own statement to Detective O'Leary placed him at the scene of the shooting. Finally, Lee's testimony established that defendant had been actively looking for Parks. Although the testimony of Parks and Newell was inconsistent concerning the number of people in the currency exchange at the time of the shooting, that inconsistency was a matter of credibility to be resolved by the trier of fact. The evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

■ Defendant last contends that the circuit court erred in denying his *pro se* motion to reduce sentence without first appointing counsel. He contends that the hearing on his motion to reduce his sentence was a critical stage of the proceeding because he may have lost the right to appeal his sentence without having first filed such a motion. (See *Mempa v. Rhay* (1967), 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (holding that counsel must be afforded at all stages of the proceeding where substantial rights may be affected or legal rights could be lost if not exercised).) We need not reach this issue, however, because the Illinois Supreme Court recently held in *People v. Lewis* (1994), 158 Ill. 2d 386, that there was no obligation under the prior version of section 5—8—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(c) (now codified as 730 ILCS 5/5—8—1(c) (West 1992))) to file a motion to reduce sentence in order to preserve sentencing issues for appeal. Thus, because no rights could be lost by failing to file a motion to reduce sentence, such a motion could not be considered a critical stage of the proceedings. Accordingly, the circuit court did not err in denying defendant's *pro se* motion without first appointing counsel.

Despite the supreme court's recent holding in *Lewis*, defendant urges us to consider a recent amendment to section 5—8—1(c) which provides in pertinent part that "[a] defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence." (Pub. Act 88—311, § 15, eff. August 11, 1993.) Although defendant argues that this amendment makes a post-sentencing hearing a critical stage of the proceeding at which the right to counsel exists (see *People v. Brasseaux* (1993), 254 Ill. App. 3d 283, 288, 625 N.E.2d 1115 (reversing the circuit court's denial of a *pro*

*se* motion to reconsider a sentence following a guilty plea because no counsel was provided to represent the defendant)), we reject defendant's invitation for such a ruling because the amendment does not apply in this case and any statement regarding the effect of the amendment would merely be advisory.

■ Although not raised by either defendant or the State, we believe that the court erred in imposing concurrent sentences rather than consecutive. Under section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a) (now codified as 730 ILCS 5/5—8—4(a) (West 1992))), a circuit court *must* impose consecutive sentences where multiple offenses are part of a single course of conduct without a substantial change in the criminal objective, when (1) one of the convictions is a Class X or a Class 1 felony and the defendant inflicted severe bodily injury, or (2) one of the convictions is for either aggravated criminal sexual assault or criminal sexual assault. (*People v. Wittenmeyer* (1992), 151 Ill. 2d 175, 196, 601 N.E.2d 735.) Because the record here establishes that defendant committed attempted first degree murder (offenses subject to Class X sentences)[1] against both Tonya Parks and Whitney Newell in a single course of conduct without changing his objective, and because the record is clear that he inflicted severe bodily injury to each of them, defendant's sentences must be vacated and the cause remanded for a new sentencing hearing for the circuit court to determine the appropriate sentences to be imposed consecutively.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, vacated in part, and remanded.

Affirmed in part; vacated in part and remanded.

HARTMAN and McCORMICK, JJ., concur.

---

[1]Although we recognize that attempted first degree murder is subject to a Class X sentence rather than being a Class X offense in itself, we consider that to be a distinction without a difference for purposes of consecutive sentencing under section 5—8—4(a). See *People v. Johnson* (1992), 149 Ill. 2d 118, 159, 594 N.E.2d 253, *cert. denied* (1993), 506 U.S. 1056, 122 L. Ed. 2d 138, 113 S. Ct. 986 (stating that multiple convictions for attempted first degree murder are properly sentenced consecutively if the requirements of section 5—8—4 are met).