THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBBIE L. BISHOP, Defendant-Appellant.

Second District   No. 2—02—0620

Opinion filed September 17, 2004.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE McLAREN delivered the opinion of the court:

Following a jury trial, defendant, Robbie L. Bishop, was convicted of four counts of criminal sexual assault (720 ILCS 5/12—13(a)(1), (a)(3) (West 2002)) and four counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(2) (West 2002)). Defendant was sentenced to 30-year concurrent terms for the counts of aggravated criminal sexual assault and 15-year concurrent terms for the counts of criminal sexual assault. On appeal, defendant contends that (1) the trial court erred by denying his motion to suppress evidence obtained from his bedroom; (2) he was denied a fair trial due to various prosecutorial comments and improper testimony; (3) counts II and VI omitted an essential element of the offense; (4) the indictment did not apprise him that the State intended to treat his conduct as multiple acts; (5) four of his convictions of criminal sexual assault should be vacated as lesser included offenses of aggravated criminal sexual assault; (6) six of his convictions violate the one-act, one-crime rule because they were based on the same physical act; and (7) he must have a new sentencing hearing because the trial court erroneously imposed concurrent rather than consecutive sentences. We affirm in part, vacate in part, and remand with directions.

## BACKGROUND

In an eight-count indictment, defendant was charged with four counts of aggravated criminal sexual assault and four counts of criminal assault, all against his daughter, Q.B. Four counts alleged penile penetrations to Q.B.'s vagina between September 5, 1998, and December 5, 2000. Three counts alleged penile penetrations to Q.B.'s anus between September 1, 2000, and December 5, 2000, and one count alleged penile penetration to Q.B.'s anus between September 5, 1998, and December 5, 2000. Count I alleged that defendant caused bodily harm to Q.B. by placing his penis in her vagina by the threat of force and causing her to become pregnant (aggravated criminal sexual assault). Count II alleged that defendant, a family member of Q.B., caused her bodily harm by placing his penis in her vagina and causing

her to become pregnant (aggravated criminal sexual assault). Count III alleged that defendant placed his penis in the vagina of Q.B. by the threat of force (criminal sexual assault). Count IV alleged that defendant, a family member of Q.B., placed his penis in her vagina when she was under the age of 18 (criminal sexual assault). Count V alleged that defendant caused bodily harm to Q.B.'s anus by placing his penis in her anus by the threat of force (aggravated criminal sexual assault). Count VI alleged that defendant, a family member of Q.B., caused bodily harm to her anus by placing his penis in her anus (aggravated criminal sexual assault). Count VII alleged that defendant placed his penis in the anus of Q.B. by the threat of force (criminal sexual assault). Count VIII alleged that defendant, a family member of Q.B., placed his penis in her anus when she was under the age of 18 (criminal sexual assault).

On August 21, 2001, defendant filed a motion to suppress evidence obtained from his bedroom. At an evidentiary hearing, Waukegan police detectives Anthony Joseph, Fernando Villafuerte, and Brian Mullen offered consistent testimony regarding events on December 5, 2000. On that day, Q.B., age 15, told the detectives that defendant was sexually abusing her. She informed them that she lived with her sister and defendant and that defendant had gained custody of her when she was nine. Q.B. further informed the detectives that she had been assaulted by defendant in his bedroom the night before. According to Q.B., defendant had used a condom. She told the detectives that they would find the soiled condom in a trash can in his bedroom. She also indicated that they would find on a safe next to the bed a jar of Vaseline that defendant had used for lubrication. In addition, they would find in one of his dresser drawers birth control pills that he was making her take.

Q.B. accompanied the detectives to the residence that night and informed them that defendant was at work. She opened the door with her keys and they followed her inside. After tending to her puppy, Q.B. walked upstairs and pointed to a bedroom with an open door, indicating that it was defendant's bedroom. Q.B. did not indicate that the bedroom door was ever locked or that she was not allowed to go into the room. The detectives did not ask Q.B. if she had permission to go into the bedroom and did not seek defendant's consent to search the room. The trash can was visible from the hall. The detectives followed Q.B. into the bedroom and observed a soiled condom and a condom wrapper in the trash can. In addition, a jar of Vaseline was on top of a safe directly next to defendant's bed. The officers also recovered birth control pills in an opaque bag from a dresser drawer that Q.B. instructed them to open. No other part of the bedroom or residence

was searched. An evidence technician arrived 20 to 30 minutes later to photograph and collect the evidence.

Q.B. testified that she shared one bedroom with her sister and that the other bedroom was defendant's. Q.B. had keys to the residence because defendant was usually at work when she returned from school. Q.B. was responsible for looking after her sister when defendant was at work. Defendant never kept his bedroom door locked or closed, and it was open when Q.B. was alone in the house after school. Defendant never told Q.B. that she could not go into his bedroom or that no one else was allowed in the room. The only time defendant's door was closed was when he was in the bedroom with one of his "friends." Defendant possessed a "Do not enter" sign and Q.B. knew that he did not want "strangers" in the room. Q.B. was allowed to go in and out of his bedroom when the door was open.

Defendant testified that he was renting the house and had lived there with his two daughters for about a year and a half. Defendant generally worked from 3 a.m. to 2:30 p.m. According to defendant, he kept the door closed the majority of the time when he was not at home. He had a sign that said "Do not enter without knocking," but there was no key to lock the door from the outside. Q.B. was often in his room watching videos or sleeping. In early December 2000, defendant brought a woman home and found Q.B. in his bed. He told her to leave his room.

The trial court denied defendant's motion to suppress, concluding that Q.B. had common authority of the house and of the rooms in the house. In the court's view, Q.B. had authority to walk into the bedroom "for whatever purpose," although defendant did not want her "hanging out in his room watching TV" because he may bring home "company." The court also found that Q.B. had apparent authority to consent to the search of defendant's bedroom. According to the court, it was reasonable for the detectives to believe that she had authority to be in the bedroom since the door was open and there was no sign indicating "Do not enter."

The case proceeded to trial on February 19, 2002. Prior to jury selection, defendant filed a motion to reconsider the denial of the motion to suppress. The trial court denied the motion, concluding that Q.B. possessed common authority over the bedroom and that defendant's testimony that she lacked permission was not credible.

Terri DeWees, an emergency room nurse with training in sexual assault examinations, testified on behalf of the State. DeWees worked at St. Therese Hospital in December 2000. On the evening of December 5, 2000, DeWees examined Q.B. Q.B. informed DeWees that defendant had put his "thing" in her "bottom." Q.B. further

stated that these incidents had been occurring "most every night" and had started when she was nine years old. When DeWees touched Q.B., she observed some pain or tenderness of the upper buttocks near the tailbone that could be consistent with paddling or some type of penetration. There were no signs of vaginal injury. Upon examining Q.B.'s anus or rectal area, however, DeWees discovered two injuries. At the bottom of her anus, in the six o'clock position, there was a two-millimeter abrasion. In addition, there was some apparent scar tissue at the three o'clock position. DeWees explained that when a body suffers injury, scars or thickening of the tissue will form as a part of the healing process.

Q.B., age 16 at the time of trial, testified that she was either 10 or 12 when she and her sister began living with defendant. Although some touching had occurred before she moved in with him, she had denied any sexual abuse to a worker at the Department of Children and Family Services (DCFS) on several occasions. Q.B. did not report any abuse because she wanted defendant back in her life. Although defendant was strict with Q.B. and her sister, she felt safe and loved, and he maintained a nice home for them.

When Q.B. was 12, defendant started having her lie down in his bed with him. Sometimes she would have her clothes on, other times she would not. With his hand, defendant would touch her breasts, buttocks, and private area, but never inside her private part. He would also put his penis between her legs and rub it against her vagina. Sometimes she would face him and other times she would face away. These incidents always occurred in defendant's bedroom. Defendant would call her into his room and say "I want to do something" or tell her to remove her clothes. If Q.B. refused, defendant would threaten to hurt her. Defendant would sometimes use a condom. In addition, he would put Vaseline on her vagina and on his penis. When Q.B. was between the ages of 12 and 14, defendant called her into his bedroom two or three times a week.

When Q.B. was 14, during the month of July, defendant told Q.B. that she looked pregnant. On a subsequent night, Q.B. doubled over in pain. A pregnancy test that defendant purchased was positive. The next day, Q.B. went to the Lake County Health Department. Q.B. signed in under the name of "Jasmine Smith" because defendant told her not to use her real name. The Health Department confirmed that Q.B. was pregnant. Less than a week later, Q.B. made an appointment to get an abortion. Until the pregnancy, defendant was having sexual contact with Q.B. about three times a week. After learning of the pregnancy, defendant did not have sexual contact with her until a couple of weeks after the abortion.

Following the abortion, defendant put his "private part" in her "behind" instead of between her legs. This caused Q.B. to cry. In addition, defendant would rub her breasts and vagina and then have her put Vaseline on his "private part." Defendant would lie on his back, tell Q.B. to "sit on it," and move her waist up and down. Defendant would ejaculate during the encounters, sometimes into a condom. Afterwards, Q.B. would shower and defendant would sit with her on a couch and tell her that he was sorry and that he would never do it again. At times, he would cry and say he needed help.

Q.B. did not tell anyone about these incidents until December 2000, despite being questioned by her paternal grandmother and aunt. On December 4, 2000, Q.B. got in trouble for not telling defendant that her girlfriend was walking her to school. Her girlfriend waited outside the door and never came inside the house. Defendant "whooped" Q.B. on the buttocks with a thick wooden paddle more than 20 times. The paddling made her cry. After defendant had sexual contact with her the night of the paddling, Q.B. decided that she was tired of his conduct and of his promises. As a result, she wrote a letter to her gym teacher.

Kelly Gannon, a forensic biologist at the Northern Illinois Police Crime Laboratory, testified that she received a condom and other items for analysis. She identified sperm cells in and on the condom.

Detective Mullen testified regarding the search of the residence on December 5, 2000. According to Detective Mullen, Q.B. was sent to the hospital and then interviewed at the police department. During the interview, Q.B. informed the detectives that the most recent assault had occurred in defendant's bedroom the night before. According to Q.B., the detectives would find a condom, a jar of Vaseline, and some birth control pills in defendant's bedroom. All of the items were recovered. Q.B. indicated to Detective Mullen that defendant had sexual contact with her approximately 20 times.

The State's final witness was Peter Yallaly, a forensic scientist for the Northern Illinois Police Crime Laboratory. Yallaly compared samples of the condom itself and samples of the substance in the condom to a blood sample from Q.B. and a saliva sample from defendant. Of the four samples, one of the two from the condom surface contained DNA from two different people. Yallaly opined that the profile from the condom matched the profile from defendant's saliva. Yallaly further opined that the "minor contributor" to the DNA on the condom was consistent with the blood standard received from Q.B. and that she could not be excluded as the source. However, due to the limited amount of DNA on the sample tested, he was unable to say whether the minor contributor was male or female.

The sole witness for the defense was defendant. He denied ever placing his penis in Q.B.'s vagina or anus or touching her breasts or vagina. Defendant stated that, on December 4, 2000, he masturbated to the point of ejaculation while watching an adult video. He wore a condom and placed it in the trash can in his bedroom afterward. Defendant kept a jar of Vaseline in his room to provide a shine after he shaved his head and also for sexual intercourse with female visitors. Birth control pills that Q.B. had been given at the abortion clinic were kept in his dresser.

On the morning of December 4, one of Q.B.'s friends came to the house and was introduced to defendant. Q.B. denied that her friend had been in the house before, although Q.B.'s sister informed defendant that this was not true. Q.B. then admitted that the girl had previously been in the house and defendant struck her on the buttocks with the paddle more than 20 times. Defendant told Q.B. that he was going to "whoop" her all week because she treated his rules as though they did not matter. The next day, defendant's mother called him on his way home from work because the police were looking for him. After driving to the house and finding no one there, he drove to the police station, where he was arrested.

The jury found defendant guilty on all counts. Defense counsel filed a motion for a new trial, which was subsequently denied. The trial court imposed concurrent sentences of 30 years for the four counts of aggravated criminal sexual assault and 15 years for the four counts of criminal sexual assault. Defendant's motion to reconsider the sentences was denied. Defendant's timely notice of appeal followed.

## ANALYSIS

### I. Motion to Suppress

Defendant's first argument on appeal is that the trial court erred by denying defendant's motion to suppress. Essentially, defendant challenges the scope of Q.B.'s authority. Defendant does not contend that Q.B. lacked authority to consent to a search of the common areas of the residence; rather, he contends that Q.B.'s authority did not extend to his bedroom. Because defendant did not want Q.B. "hanging out" in his room, he asserts that Q.B.'s access to the room was inferior to his. Additionally, Q.B. was aware that defendant did not want "strangers" in the room. As a result, he argues that she lacked common authority to allow the detectives to enter or search his bedroom. The State counters that the family relationship between defendant and Q.B. created a presumption of common authority to consent to a search of his bedroom and that defendant failed to establish his exclusive possession of the room. We agree with the State.

The trial court did not find defendant's testimony at the suppression hearing to be credible, and defendant accepts the version of events conveyed by the State's witnesses. With respect to our standard of review, we uphold the factual findings and witness credibility determinations of the trial court unless they are against the manifest weight of the evidence, but review *de novo* the ultimate ruling on a motion to suppress. *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001).

■ In general, the fourth amendment prohibits the warrantless search of a home. *People v. Huffar*, 313 Ill. App. 3d 593, 596 (2000). However, a warrantless search conducted with the consent of a third party possessing common authority over the premises is not prohibited by the fourth amendment. *People v. Brooks*, 277 Ill. App. 3d 392, 399 (1996). The authority that justifies third-party consent is not based on the law of property but is based on mutual use of the property by persons generally having joint access or control for most purposes. *People v. Bull*, 185 Ill. 2d 179, 197 (1998). The burden of establishing common authority rests on the State. *Bull*, 185 Ill. 2d at 197.

Common authority is recognized in situations involving family, marital, or cohabitant relationships. *People v. Pickens*, 275 Ill. App. 3d 108, 112 (1995). Where the defendant lives with his parents or a close relative, and the relative consents to a search of the defendant's bedroom, courts will presume that the relative has sufficient common authority over the bedroom to authorize the search. *People v. Bliey*, 232 Ill. App. 3d 606, 615 (1992). Cases involving a relative's third-party consent to search have focused on whether the defendant has established his exclusive possession of the searched premises. *People v. Brown*, 162 Ill. App. 3d 528, 539 (1987). Specifically, two factors indicative of exclusive possession are whether the room was locked in the defendant's absence and whether the defendant gave explicit instructions not to allow anyone into the room. *Brown*, 162 Ill. App. 3d at 539-40. Where the evidence fails to establish both of these factors, the attack on the third-party consent to search has failed. *Brown*, 162 Ill. App. 3d at 540.

■ In this case, we conclude that Q.B. possessed common authority to consent to the search of defendant's bedroom. At the hearing, Q.B. testified that she was allowed to go in and out of his bedroom when the door was open, and that the door was open when she was alone in the house after school. According to Q.B., defendant never kept his door locked or closed when he was gone. In fact, the only time the bedroom door was shut was when he brought one of his "friends" home. In addition, defendant never told Q.B. that she could not go into his bedroom or that no one else was allowed in the room. Finally, none of the detectives saw a sign on the door indicating "Do not enter"

when they searched his room. Thus, defendant has failed to rebut the presumption of common authority that exists when family members live together.

Defendant's argument that Q.B. did not possess the requisite authority because she knew that he did not want "strangers" in his bedroom is unpersuasive. Defendant failed to establish exclusive possession of his room. First, there is no evidence that defendant explicitly instructed Q.B. not to allow "strangers" into his room. See *Brown*, 162 Ill. App. 3d at 540 (defendant's lack of permission cannot be equated with explicit instruction not to enter and not to let anyone else enter). Second, defendant admitted that he could not keep the door locked in his absence, since the door was impossible to lock from the outside. Absent proof that the door was locked and that Q.B. had explicit instructions not to allow anyone into the bedroom, defendant's attack on Q.B.'s consent to search necessarily fails.

Likewise, we reject defendant's argument that Q.B.'s degree of authority was substantially inferior to his. Defendant argues that the privacy rights of a parent are inherently superior to the rights of a minor child. However, a minor child living at home is competent to give lawful consent to search, and age alone is never an automatic barrier to capacity to consent. See *People v. Holmes*, 180 Ill. App. 3d 870, 873 (1989) (defendant's 11-year-old daughter who was often left home alone to baby-sit her younger brother validly consented to search of backyard). Moreover, Q.B.'s testimony clearly demonstrated that she had unlimited access to defendant's bedroom in his absence, and defendant has agreed not to challenge the evidence presented by the State at the suppression hearing. Accordingly, we hold that Q.B. possessed the requisite authority to consent to a search of defendant's bedroom.

## II. Sufficiency of Indictment

■ Defendant next contends that two counts of the indictment omitted an essential element of the offense charged. Specifically, defendant contends that counts II and VI, charging aggravated criminal sexual assault, failed to allege that Q.B. was under 18 years of age. The State argues that both counts reference the statute and that the missing element was supplied by counts IV and VIII. We agree with the State.

Counts II and VI both alleged aggravated criminal sexual assault based on the commission of a criminal sexual assault and the aggravating circumstance of bodily harm. The form of criminal sexual assault underlying each count is defined as "an act of sexual penetration with a victim who was under 18 years of age when the act was

committed and the accused was a family member." 720 ILCS 5/12—13(a)(3) (West 2002). Count II alleged aggravated criminal sexual assault in that defendant "committed a criminal sexual assault, in violation of 720 ILCS 5/12—13(a)(3), against [Q.B.] in that, while being a family member of [Q.B.], the defendant placed his penis in the vagina of [Q.B.] and in so doing caused bodily harm to [Q.B.] by causing her to become pregnant in violation of 720 ILCS 5/12—14(a)(2)." Count VI alleged aggravated criminal sexual assault in that defendant "committed a criminal sexual assault, in violation of 720 ILCS 5/12—13(a)(3), against [Q.B.] in that, while being a family member of [Q.B.], the defendant placed his penis in the anus of [Q.B.] and in so doing caused bodily harm to [Q.B.] by causing injury to her anus, in violation of 720 ILCS 5/12—14(a)(2)." Counts IV and VIII of the indictment alleged criminal sexual assault based on defendant, a family member of Q.B., placing his penis in her vagina and anus when she was under the age of 18. 720 ILCS 5/12—13(a)(3) (West 2002). Specifically, count IV alleged that defendant, "a family member of [Q.B.], committed an act of sexual penetration with [Q.B.], who was under 18 years of age when the act was committed, in that the said defendant placed his penis in the vagina of [Q.B.], in violation of 720 ILCS 5/12—13(a)(3)." Count VIII alleged that defendant, "a family member of [Q.B.], committed an act of sexual penetration with [Q.B.], who was under 18 years of age when the act was committed, in that the said defendant placed his penis in the anus of [Q.B.], in violation of 720 ILCS 5/12—13(a)(3)."

At the close of the State's evidence, defense counsel moved to dismiss counts II and VI because they failed to allege that Q.B. was under the age of 18. The trial court denied the motion because both counts cited section 12—13(a)(3), which defines criminal sexual assault, and the age element is included in the statute. Defense counsel renewed this argument in a motion for a directed verdict after all the evidence had been presented. Again, the trial court denied the motion, noting that defendant was on notice of the charges against him and that the testimony supported the fact that Q.B. had not attained the age of 18.

Where, as here, the charging instrument is attacked during trial, the court determines whether the instrument strictly complies with the pleading requirements set out in section 111—3(a) of the Code of Criminal Procedure of 1963. 725 ILCS 5/111—3(a) (West 2002); *People v. Swanson*, 308 Ill. App. 3d 708, 711 (1999). Section 111—3 is designed to inform the defendant of the nature of the charges against him so as to allow him to prepare a defense and to assure that the charged offense serves as a bar to subsequent prosecutions for the same conduct.

*People v. Selby*, 298 Ill. App. 3d 605, 615 (1998). Section 111—3(a)(3) requires that the charging instrument set forth the elements of the offense charged. *People v. Johnson*, 69 Ill. App. 3d 248, 250 (1979). It is well established that, in testing the sufficiency of a multicount indictment, elements missing from one count may be supplied by another. *People v. Johnson*, 231 Ill. App. 3d 412, 423 (1992). In other words, various counts of a charging instrument may be read together, so that elements contained in one count are transferrable to complete and make valid a charge contained in another. *People v. Martin*, 266 Ill. App. 3d 369, 374 (1994).

In this case, the trial court properly denied defendant's motion to dismiss counts II and VI. While both counts failed to allege the element of Q.B. being under the age of 18, counts IV and VIII specifically apprised defendant that he was being charged with criminal sexual assault based on Q.B. being under the age of 18. Reading the multicount indictment as a whole, the under-18 element missing in counts II and VI was supplied by counts IV and VIII. Further, both counts II and VI referenced section 12—13(a)(3), which specifies an act of sexual penetration by a family member with a victim under 18 years of age. Consequently, the indictment was a valid charging instrument that met the standards of section 111—3 of the Code of Criminal Procedure.

## III. Denial of a Fair Trial

### A. Prosecutorial Misconduct

◼ Defendant next argues that he was denied a fair trial due to several errors that occurred during the course of the trial. Specifically, defendant points to three instances of prosecutorial misconduct during closing argument as well as to testimony from Q.B. that he had been in jail previously. According to defendant, this was a very close case and these errors, both individually and cumulatively, denied him a fair trial.

We begin by considering the alleged improper comments made by the prosecutor during closing argument. First, defendant argues that the prosecutor overstated the testimony by remarking that Q.B. had "abrasions," when nurse DeWees had testified to only one abrasion. Second, defendant contends that the prosecutor went beyond the testimony when discussing defendant's threats to harm Q.B. Last, defendant argues that, during rebuttal argument, the prosecutor interjected what amounted to her own testimony when she commented on forensic scientist Yallaly's inability to say whether the lesser profile of DNA came from a male or a female.

Courts allow prosecutors great latitude during closing argument, and the State may comment on the evidence and all inferences reason-

ably drawn from the evidence. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). Reviewing a challenge to comments made by the State during closing argument, the comments must be considered in the context of the entire closing arguments of the parties. *People v. Soto*, 342 Ill. App. 3d 1005, 1016 (2003). We will not disturb the verdict even if prosecutorial comment exceeds the bounds of proper argument unless the remark caused substantial prejudice to the defendant. *Soto*, 342 Ill. App. 3d at 1016-17. In determining whether substantial prejudice occurred, the court must consider the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *People v. Williams*, 333 Ill. App. 3d 204, 214 (2002). In order to constitute reversible error, an error in closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark. *Soto*, 342 Ill. App. 3d at 1017. In other words, the comments must have constituted a material factor in the conviction. *People v. Robinson*, 157 Ill. 2d 68, 84 (1993). Finally, the regulation of the substance and style of the closing argument is within the trial court's discretion, and we will not disturb the trial court's determination concerning the propriety of the remarks absent a clear abuse of discretion. *Blue*, 189 Ill. 2d at 128.

With respect to the prosecutor's statement of "abrasions" rather than "abrasion," we find no error. When referring to the testimony of nurse DeWees, the prosecutor stated, "There is bodily harm also in her anus. She has rectal scarring. She has abrasions." Defense counsel's objection was overruled. According to defendant, the prosecutor overstated the testimony, since nurse DeWees had testified to only one abrasion. While defendant is correct that nurse DeWees described only two injuries, one small abrasion at the bottom of the anus and scar tissue at the three o'clock position, we agree with the State that the prosecutor's use of the word "abrasions" referred to the recent abrasion as well as the rectal scarring. Viewing the State's argument in its entirety, we note that this was an isolated remark. On all other occasions, the prosecutor stated that nurse DeWees had found "a rectal abrasion." Further, even if the State was guilty of overstating the evidence, such a slight overstatement did not amount to reversible error. See *People v. Enoch*, 189 Ill. App. 3d 535, 551 (1989) (it is not reversible error when a prosecutor overstates evidence that is partially corroborated).

Defendant's second contention is more meritorious. In discussing defendant's threats to harm Q.B. if she told anyone about what was happening, the prosecutor stated:

> "[Q.B.] told you that at one point [defendant] had threatened to kill her, threatened to do harm to her if she would say anything.

Why wouldn't she believe that? *In the past,* she had been beaten with him by a paddle over 20 times." (Emphasis added.)

As defendant rightly notes, Q.B. testified that it was only on December 4, 2000, that defendant beat her with the paddle over 20 times; *i.e.,* she did not testify that such an incident occurred before defendant threatened her. Thus, the prosecutor misstated the evidence on this point. Clearly, however, the comment caused no substantial prejudice. Whether defendant's threat was credible was, at most, purely collateral to whether defendant sexually abused Q.B. As a result, this error is not reversible. See *People v. King,* 135 Ill. App. 3d 152, 156 (1985) (tangential argument does not require reversal).

Defendant's third alleged instance of prosecutorial misconduct concerns the prosecutor's explanation regarding why forensic scientist Yallaly was unable to identify the gender of the lesser DNA profile found on the condom sample. Defendant points to the following remarks made by the prosecutor:

"MS. HORNER [Prosecutor]: Using your common sense, and your knowledge that you have outside in the world, why would that be? Well, males have an X and Y.

MR. SCHELLER [Defense counsel]: Objection, Judge, that's not been testified to.

MS. HORNER: Females have X. X is there no matter what.

MR. SCHELLER: Judge, I'm going to object. It's not been testified to.

THE COURT: Overruled. The jury has heard the testimony."

According to defendant, the prosecutor's argument went beyond the evidence since Yallaly had not testified about X and Y chromosomes or given an explanation for why he had been unable to determine the gender of the source of the lesser DNA profile.

At trial, Yallaly testified that the condom surface contained DNA from two different people. He explained that, when analyzing DNA, there are 13 different points or locations throughout the chromosomes, and the sex chromosome is XX for females and XY for males. Yallaly determined that the profile from the condom matched the profile from defendant's saliva because all 13 points were consistent. However, Yallaly was unable to determine the gender of the second source of DNA because the sample tested did not contain a complete DNA profile of that person. As a result, he was able to identify only five locations from the sample that were consistent with Q.B. Although Q.B. could not be excluded as the source, the sample did not possess enough DNA for Yallaly to opine whether the second person was female or male.

During closing argument, defense counsel argued that Yallaly never gave an opinion that the DNA on the condom matched Q.B.

Defense counsel further argued that the only two DNAs that were on the condom were both male and that no physical evidence corroborated Q.B.'s story. On rebuttal, the prosecutor explained why Yallaly was unable to determine whether the second source of DNA was male or female. She stated that males have "an X and Y" while "[f]emales have X. X is there no matter what."

We agree with the State that the prosecutor's comments during rebuttal were invited by defense counsel's argument. See *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000) (where the complained-of remarks are within a prosecutor's rebuttal argument, they will not be held improper if they appear to have been provoked or invited by defense counsel's argument); *People v. Thomas*, 172 Ill. App. 3d 172, 179 (1988) (remarks generally considered improper are acceptable if invited by argument of defense counsel). While the sample did not have enough DNA for Yallaly to declare a match with Q.B., he could not exclude her as the possible source, and 5 out of 13 locations in the sample were consistent with Q.B.'s DNA. The prosecutor's statements regarding the sex chromosomes were invited by defense counsel's argument that both sources of DNA were male. In addition, we note that the prosecutor asked the jurors to use their common sense and knowledge "outside in the world" when drawing this inference from Yallaly's testimony. As such, the prosecutor did not misstate or overstate Yallaly's testimony, but argued a reasonable inference therefrom. Further, the jury was instructed to disregard statements made in closing argument not based on the evidence. Finally, even if we were to find the comments improper, they did not result in substantial prejudice such that the result would have been different had the comments not been made.

## B. Improper Testimony

■ Defendant also argues that he was deprived of a fair trial due to Q.B.'s response to a question posed by the prosecutor on direct examination. Q.B. testified that she had not reported the sexual abuse to anyone, despite questioning by her grandmother and aunt. The prosecutor asked her why she did not tell anyone. Q.B. replied that "[she] didn't want [defendant] to go back to jail." Defense counsel objected to the testimony and, outside the presence of the jury, moved for a mistrial. The prosecutor responded that the matter had not been dwelled upon and that an instruction from the court would cure any error. The trial court determined that the prosecutor had not purposely elicited the testimony and denied the motion for a mistrial. The court then instructed the jury to disregard the answer.

Relying on *People v. Goodwin*, 69 Ill. App. 3d 347 (1979), defendant argues that the improper reference to defendant having been in jail denied him a fair trial. According to defendant, the disclosure of the fact that he had previously been in jail was extremely prejudicial. Although his prior convictions did not involve any sex offenses, Q.B.'s statement allowed the jury to speculate that he had committed a similar offense in the past. In addition, evidence of his prior convictions was prohibited from being disclosed since the trial court had previously granted a motion *in limine* to that effect. The State counters that only a single question was involved, that it was not intended to elicit other-crimes evidence, that the jury was instructed to disregard the testimony, and that, during cross-examination, defendant referred to being "locked up."

In order to determine whether defendant's right to a fair trial has been compromised, we ask whether a substantial right has been affected to such a degree that we cannot confidently state that his trial was fundamentally fair. *Blue*, 189 Ill. 2d at 138. Not every improper reference entitles a defendant to a new trial since such evidence can be harmless. *People v. Wilson*, 32 Ill. App. 3d 842, 847 (1975). Where it appears impossible to reasonably anticipate any different result on retrial, such improper testimony is harmless. *Wilson*, 32 Ill. App. 3d at 847.

We are not persuaded that Q.B.'s response regarding defendant's previous jail time deprived him of a fair trial. As defendant concedes, *Goodwin* is distinguishable from the case at bar in several respects. In *Goodwin*, a police officer testified that, at the moment of arrest, the defendant had asked to be let go because " 'he did not want to go back to prison again.' " *Goodwin*, 69 Ill. App. 3d at 349. Despite this comment, the trial court refused to strike the police officer's testimony or instruct the jury to disregard it. Further, the officer's response was "volunteered and not responsive to the question" and possibly intended to bring out the fact that the defendant had been incarcerated. *Goodwin*, 69 Ill. App. 3d at 349.

Unlike in *Goodwin*, the trial court in this case sustained defense counsel's objection and instructed the jury to disregard the testimony. Moreover, the trial court noted that the prosecutor did not intend to elicit such testimony and that Q.B.'s answer was responsive to the question. The matter was not dwelled upon or further mentioned during closing argument. Finally, we fail to see how Q.B.'s reference to jail was reversible error when, during cross-examination, defendant testified that the "paddle came into effect a year before I was locked up." Thus, defendant was not denied a fair trial due to Q.B.'s reference to his previous jail time.

## IV. One Act, One Crime

■ Next, defendant argues that the number of convictions should be reduced from eight to two (one for each type of penetration). Multiple convictions cannot be carved from the same physical act. *People v. King*, 66 Ill. 2d 551, 566 (1977). Thus, defendant argues that he cannot be convicted of four counts of aggravated criminal sexual assault and four counts of criminal sexual assault where only two types of sexual penetration were contained in the indictment. Defendant maintains that six of his convictions should be vacated because the eight counts contained in the indictment did not distinguish the acts in a way that notified him that the State was seeking separate convictions rather than merely relating alternative theories of liability for each type of penetration. We agree with defendant. Like in *People v. Crespo*, 203 Ill. 2d 335 (2003), defendant was not apprised, prior to trial, that the State intended to prosecute him for separate acts.

In all, defendant was charged with two counts each of criminal sexual assault and aggravated criminal sexual assault based on separate instances of vaginal penetrations from September 5, 1998, to December 5, 2000, and two counts each of criminal sexual assault and aggravated criminal sexual assault based on anal penetrations either from September 5, 2000, to December 1, 2000, or from September 5, 1998, to December 5, 2000.

The United States and Illinois Constitutions both require that a defendant in a criminal prosecution be informed of the nature and cause of the accusations. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Our supreme court has stated that under Illinois law, a defendant has a fundamental right to be informed of the nature and cause of the criminal accusations against him so that he may prepare a defense, not merely present a defense. *Crespo*, 203 Ill. 2d at 345.

In *Crespo*, the defendant stabbed the victim three times, and each stabbing could have been the basis of a separate conviction. *Crespo*, 203 Ill. 2d at 344. However, the counts as charged did not differentiate among the separate stab wounds, but merely offered different theories of criminal culpability. *Crespo*, 203 Ill. 2d at 342. In reiterating a defendant's fundamental right to be informed of the nature and cause of the criminal accusations against him so that he may prepare a defense, the court noted that the defendant would not have known before trial that the State considered each of the separate stabs to be a separate offense. *Crespo*, 203 Ill. 2d at 345. Accordingly, the court held that an indictment must indicate that the State intends to treat the conduct of a defendant as multiple acts in order for multiple convictions to be sustained. *Crespo*, 203 Ill. 2d at 345.

We agree with defendant that *Crespo* is controlling in this case. Like the indictment in *Crespo*, the indictment in this case reveals that the counts charging defendant do not differentiate among eight separate acts of penetration. Rather, these counts charge defendant with only two separate acts of penetration under different theories of criminal culpability. The fact that the counts allege one long time frame does not establish that each of the two acts happened more than once. All the State had to do was add to each count the words "an act separate from the acts set forth in the other counts." The indictment could also have indicated two separate time frames.

We recognize that the prosecutor may have indicated in the opening and closing statements that separate offenses occurred over a period of time. The jury instructions may also have indicated that the State was seeking convictions for eight separate acts. However, the alleged notice was insufficient because it was not prior to trial and therefore does not satisfy *Crespo*.

The State cites *People v. Olivieri*, 334 Ill. App. 3d 311, 318 (2002), to support its argument. In *Olivieri*, the Appellate Court, Fourth District, held that three counts of aggravated criminal sexual assault were sufficiently distinguished to sustain separate convictions and consecutive sentencing. However, the defendant in *Olivieri* was notified at a preliminary hearing, prior to trial, that the State intended to seek multiple convictions. *Olivieri*, 334 Ill. App. 3d at 315. Thus, Olivieri was able to prepare a defense prior to trial. There is nothing in this record indicating that defendant was notified prior to trial that the State intended to seek eight separate convictions. Accordingly, *Olivieri* is not controlling. See also *People v. Palmer*, 346 Ill. App. 3d 942, 953 (2004) (this court vacated convictions because, like in *Crespo* and unlike in *Olivieri*, the defendant was not apprised prior to trial that the State intended to prosecute him for separate acts); *Palmer*, 346 Ill. App. 3d at 954 (Gilleran Johnson, J., specially concurring). To reiterate, notice during trial may allow the defendant to present a defense but it does not allow the defendant to prepare a defense. To hold otherwise would create a duty on the part of the defense counsel to seek discovery prior to trial to determine whether the counts are individual or alternative. Thus, in this case, only two convictions can stand; one for each type of penetration.

When more than one offense arises from the same physical act, a judgment of conviction and sentence should be imposed on the more serious offense. *People v. Austin*, 328 Ill. App. 3d 798, 809 (2002). "However, when multiple convictions for aggravated criminal sexual assault are obtained from a single act of penetration, there is no way

to determine the most serious conviction because none of the convictions involved either a more or less culpable mental state." *People v. Garcia*, 179 Ill. 2d 55, 71 (1997). Accordingly, we remand to the trial court for a determination as to which two counts of aggravated criminal sexual assault shall be retained, one for each type of penetration. See *People v. Bell*, 217 Ill. App. 3d 985, 1012 (1991). Due to our disposition of this issue, we do not reach defendant's other arguments urging us to reduce his convictions from eight to two, one for each type of penetration.

## V. Sentencing

█ Defendant's final contention on appeal is that he must have a new sentencing hearing because the trial court erroneously imposed concurrent sentences of 30 years for the four counts of aggravated criminal sexual assault and 15 years for the four counts of criminal sexual assault. According to defendant, section 5—8—4(b) of the Unified Code of Corrections (730 ILCS 5/5—8—4(b) (West 2002)) mandates the imposition of consecutive sentences in this case, and thus his concurrent sentences are void. The State confesses error on this point and we agree.

Section 5—8—4(b) provides that consecutive sentences must be imposed when the offenses arose from separate courses of conduct and one of the offenses was a triggering offense. 730 ILCS 5/5—8—4(b) (West 2002); *People v. Harris*, 203 Ill. 2d 111, 117 (2003). Here, defendant's offenses of aggravated criminal sexual assault and criminal sexual assault arose from separate courses of conduct and were triggering offenses. Thus, all of the sentences imposed must be consecutive. 730 ILCS 5/5—8—4(b) (West 2002). Defendant's concurrent sentences are void, and we must remand the cause for resentencing. See *People v. Arna*, 168 Ill. 2d 107, 113 (1995) (concurrent sentences are void when consecutive sentences are mandatory).

For the above reasons, we vacate defendant's convictions on counts III, IV, VII, and VIII. As to counts I and II, and counts IV and V, the convictions on those counts are remanded to the trial court for clarification as to which shall be retained, one conviction for each type of penetration. We vacate the concurrent sentences imposed on all eight counts and, on the remaining two counts, we direct the trial court to conduct a new sentencing hearing and determine the appropriate sentences to be imposed consecutively. See *People v. Arna*, 263 Ill. App. 3d 578, 589 (1994), *aff'd*, 168 Ill. 2d 107 (1995).

Affirmed in part and vacated in part; cause remanded with directions.

HUTCHINSON, J., concurs.

JUSTICE BOWMAN, dissenting in part:

I respectfully dissent. In particular, I disagree with the majority's conclusion that, under *People v. Crespo*, 203 Ill. 2d 335 (2003), defendant's eight convictions must be reduced to two. According to my colleagues, the indictment in this case violated *Crespo* by failing to differentiate among eight separate acts of penetration. Because they determine that the counts charged defendant with only two separate acts of penetration under different theories of criminal culpability, they conclude that defendant was not apprised, prior to trial, that the State intended to prosecute him for separate acts. In my opinion, *Crespo* does not mandate the result reached by my colleagues.

First, I believe that a fair reading of the indictment in this case put defendant on notice of the need to defend against multiple charges of criminal sexual assault and aggravated criminal sexual assault. The indictment alleged acts of forcible sex over a period of time, with each count specifically referencing the sexual penetration as well as the applicable time frame. Specifically, defendant was charged with two counts each of criminal sexual assault and aggravated criminal sexual assault based on instances of vaginal penetrations from September 5, 1998, to December 5, 2000, and two counts each of criminal sexual assault and aggravated criminal sexual assault based on anal penetrations either from September 5, 2000, to December 1, 2000, or from September 5, 1998, to December 5, 2000. Because defendant's conduct consisted of separate acts on separate occasions, and because specific dates are often not ascertainable for crimes involving minors, I believe that the indictment was sufficiently specific to inform defendant of the need to defend against multiple counts.

Moreover, the facts in this case are stronger than those in *People v. Olivieri*, 334 Ill. App. 3d 311, 317 (2002), where the indictment failed to reference the specific sexual penetration in each count. While the majority concludes that *Olivieri* is not controlling here because the defendant in that case was notified at a preliminary hearing, prior to trial, that the State intended to seek multiple convictions, this distinction overlooks the holding in *Olivieri*. In *Olivieri*, the court specifically held that "the State clearly charged defendant with three separate counts of aggravated criminal sexual assault, and defendant was on notice of his need to defend against all three counts." *Olivieri*, 334 Ill. App. 3d at 315. In making this determination, the *Olivieri* court

rejected the defendant's claim that he was charged alternatively with three counts of aggravated criminal sexual assault. *Olivieri*, 334 Ill. App. 3d at 315. Applying the reasoning of *Olivieri* to the present case, where the indictment was more specific, I believe that defendant was on notice that he was charged with eight separate acts of sexual assault. That said, I also believe that, from a procedural standpoint, the practice of charging separate acts by separate counts in the charging instrument avoids some of the issues raised in *Crespo*.

Second, I believe that the indictment, coupled with the State's treatment of the crimes at trial, provides clear evidence of the State's intention to treat defendant's conduct as multiple acts. Indeed, the State's handling of the crimes in this case further supports the conclusion that the indictment alleged separate acts. The *Crespo* court based its decision not only on the indictment, but also on the way in which the crime was argued to the jury. *Crespo*, 203 Ill. 2d at 344. Accordingly, it is appropriate to consider both the indictment and the State's treatment of the crime at trial. However, by focusing exclusively on the notice defendant received prior to trial, the majority ignores a major factor in the *Crespo* decision. For this reason, I believe that the majority's interpretation of *Crespo* is too narrow.

In this case, the State's treatment of the crimes at trial informed defendant that he was being prosecuted for separate acts. In the opening statement, the State indicated:

"A couple of times a week, [Q.B.] would be called into [defendant's] bedroom. *** After hearing [Q.B.] tell you about the repeated sexual abuse, the acts of her father, what he forced her to do *** you will be able to find the defendant guilty not of one, but in *all* counts, that he has been charged with, of aggravated sexual assault, and criminal sexual assault in this case." (Emphasis added.)

Further, in the closing statement, the State consistently referred to defendant's conduct as "years of abuse." Finally, the jury received eight different verdict forms and found defendant guilty on all eight counts. For these reasons, I believe that the indictment, coupled with the State's treatment of the crimes at trial, sufficiently informed defendant that he was being prosecuted for separate offenses that occurred over a period of time.

As a final point, I believe that the concerns addressed in *Crespo* are not present here. Unlike *Crespo*, which involved multiple stab wounds inflicted in a single episode, defendant's conduct here consisted of separate acts on separate occasions. The State alleged that, over a period of at least two years, defendant engaged in separate acts of criminal sexual assault and aggravated criminal sexual assault. Thus, I fail to see how a more specific indictment would have aided

defendant in preparing his defense. The majority suggests that the counts could have indicated two separate time frames or contained language that the acts were "separate." However, I do not believe that the failure of the State to include such language rendered the indictment insufficient under *Crespo*. As the *Crespo* court stated: "Today's decision merely holds that in cases such as the one at bar, the indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained." *Crespo*, 203 Ill. 2d at 345. Given the nature of the crimes, which involved separate acts over a substantial period of time, I believe that the indictment reflected the State's intention to treat defendant's conduct as separate acts. Accordingly, I would not vacate any of defendant's convictions based on our supreme court's decision in *Crespo*.